228 Cal.App.3d 1106 (1991)
279 Cal. Rptr. 465
JEWELL NASH, Plaintiff and Appellant,
v.
FIFTH AMENDMENT, Defendant and Respondent.
Docket No. A050250.
Court of Appeals of California, First District, Division Four.
March 26, 1991.
*1108 COUNSEL
Andrew French Loomis for Plaintiff and Appellant.
Martin, Ryan & Andrada and Glenn Gould for Defendant and Respondent.
*1109 OPINION
POCHE, Acting P.J.
A bar charters an excursion ship for the purpose of having a Halloween party. The ship is owned and operated by a common carrier. During the party a passenger is killed by a bullet fired from a handgun which struck the deck after falling from beneath the costume of another passenger who is a peace officer authorized to carry a concealed weapon while not on duty. The question presented is whether a duty of care was owed by the bar to the passenger. Our answer is no.

BACKGROUND
Defendant the Fifth Amendment is a bar in Oakland, owned by Myra Gaudet, that sponsored a costume party on Halloween of 1988. Employees of defendant chartered an excursion boat on which the party would be held, advertised the event, and sold tickets.
In addition to employees of defendant and the boat's crew, approximately 85 to 90 people boarded the vessel when it departed from the Berkeley marina at about 8 p.m. One of the guests was Felton Clark, a correctional sergeant at San Quentin, who was dating Linda Tucker, an employee of defendant. Clark was wearing a Ninja costume. Unbeknownst to anyone but himself, Clark was carrying a semiautomatic handgun beneath his costume. At approximately 11:30 p.m., while Clark and Tucker were dancing, the gun fell to the deck and discharged. A single bullet struck Eugene Nash in the chest as he sat at a table on the edge of the dance floor. The ship's captain was notified, and he in turn notified the Coast Guard that he was returning immediately to the Berkeley marina. Members of the ship's crew administered oxygen to Mr. Nash. Paramedics met the ship at the marina, administered additional aid to Mr. Nash, and transported him to an Oakland hospital, where he died shortly after arrival.[1]
Within a month Mr. Nash's family commenced this action by filing a complaint for damages. The sole cause of action alleged against defendant was for negligence resulting in wrongful death.[2] Arguing that as a matter of *1110 law it owed no duty to plaintiff and that the death of Mr. Nash was not foreseeable, defendant moved for summary judgment. The trial court agreed and entered a judgment dismissing the complaint. Plaintiff thereupon perfected this timely appeal. (See fn. 2, ante.)

REVIEW
(1) "[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." (Nally v. Grace Community Church (1988) 47 Cal.3d 278, 292 [253 Cal. Rptr. 97, 763 P.2d 948].) (2) "As a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct. Such a duty may arise, however, if `(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection.' (Rest.2d Torts (1965) § 315....)" (Davidson v. City of Westminster (1982) 32 Cal.3d 197, 203 [185 Cal. Rptr. 252, 649 P.2d 894]; accord Tarasoff v. Regents of University of California (1976) 17 Cal.3d 425, 435 [131 Cal. Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) (3) The existence of a duty is a question of law to be decided by the court. (Isaacs v. Huntington Memorial Hospital (1985) 38 Cal.3d 112, 124 [211 Cal. Rptr. 356, 695 P.2d 653]; Thompson v. County of Alameda (1980) 27 Cal.3d 741, 750 [167 Cal. Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]; Amaya v. Home Ice, Fuel & Supply Co. (1963) 59 Cal.2d 295, 307-310 [29 Cal. Rptr. 33, 379 P.2d 513], overruled on other grounds Dillon v. Legg (1968) 68 Cal.2d 728 [69 Cal. Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].) "Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall." (Weirum v. RKO General, Inc. (1975) 15 Cal.3d 40, 46 [123 Cal. Rptr. 468, 539 P.2d 36].) "[T]he major ones [of those considerations] are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." *1111 (Rowland v. Christian (1968) 69 Cal.2d 108, 113 [70 Cal. Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; accord Nally v. Grace Community Church, supra, 47 Cal.3d at p. 293; Isaacs v. Huntington Memorial Hospital, supra, 38 Cal.3d at pp. 124-125.)
(4) "The relationship between a common carrier and its passengers is just such a special relationship, as is the relationship between an innkeeper and [its] guests, [and] between a possessor of land and those who enter in response to the landowner's invitation...." (Lopez v. Southern Cal. Rapid Transit Dist. (1985) 40 Cal.3d 780, 789 [221 Cal. Rptr. 840, 710 P.2d 907]; accord Peterson v. San Francisco Community College Dist. (1984) 36 Cal.3d 799, 806 [205 Cal. Rptr. 842, 685 P.2d 1193]; Rest.2d Torts, § 314A.) (5) As to owners of real property, "the duty to take affirmative action for the protection of individuals coming upon the land is grounded in the possession of the premises and the attendant right to control and manage the premises.... [¶] [T]he right of supervision and control `goes to the very heart of the ascription of tortious responsibility....'" (Sprecher v. Adamson Companies (1981) 30 Cal.3d 358, 368-369 [178 Cal. Rptr. 783, 636 P.2d 1121] [citing and quoting Connor v. Great Western Sav. & Loan Assn. (1968) 69 Cal.2d 850, 874 [73 Cal. Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224] (dis. opn. of Mosk, J.)]; see Preston v. Goldman (1986) 42 Cal.3d 108, 118-119 [227 Cal. Rptr. 817, 720 P.2d 476]; Isaacs v. Huntington Memorial Hospital, supra, 38 Cal.3d 112 at p. 134; Donnell v. California Western School of Law (1988) 200 Cal. App.3d 715, 720, 725 [246 Cal. Rptr. 199]; Steinmetz v. Stockton City Chamber of Commerce (1985) 169 Cal. App.3d 1142, 1146-1147 [214 Cal. Rptr. 405].) (6) (See fn. 3.), (7a) There is no reason why this logic should not extend to defendant, whose special relationship duties arising by reason of its status as an innkeeper[3] therefore terminated when its guests became passengers of the carrier (i.e., the ship's owner). (8) "While it is true that a landowner has a special duty to protect his invitees from the conduct of third persons, the imposition of liability on this ground ... is limited to those cases where the plaintiff is injured on premises which are owned, possessed or controlled by the defendant." (Southland Corp. v. Superior Court (1988) 203 Cal. App.3d 656, 664 [250 Cal. Rptr. 57] [citation and original italics omitted]; see Lopez v. McDonald's Corp. (1987) 193 Cal. App.3d 495, 506 [238 Cal. Rptr. 436] ["The relationship between a business establishment and its customers requires the proprietor protect its patrons from third person misconduct on the business premises...." (Italics added)]; Rest.2d Torts, § 314A, com. *1112 c, at p. 119 ["The rules stated in this Section apply only where the relation exists between the parties.... A carrier is under no duty to one who has left the vehicle and ceased to be a passenger, nor is an innkeeper under a duty to a guest who is injured or endangered while he is away from the premises." (Italics added.].)
(7b) The aspects of the duties plaintiff would have us impose upon defendant prior to the ship's departure are somewhat vague and contradictory. In the complaint, plaintiff alleged that defendant "failed to carefully and properly screen the persons who came aboard[, ...] failed to refuse passage to undesirable persons ... particularly ... Clark," and thereby "allowed a deadly weapon to be brought aboard" the ship. In her briefs plaintiff argues that "given the degree of control which [defendant] exercised over the event and its patrons" and the fact that "the passengers were at [defendant's] mercy for the duration" of the trip, defendant "should have kept guns off the boat or warned its patrons against bringing them or at least warned the other patrons of the risk of serious injury that could be caused by an uncontrolled dangerous object, such as a loaded automatic pistol, at a drinking party on a ... boat."
Leaving aside the question whether there can be a duty to disarm peace officers,[4] it is obvious that the measures specified by plaintiff would naturally occur immediately before the ship was boarded. Even before its passengers were actually on board its ship, the carrier owed them a duty of exercising reasonable care. (Kermarec v. Compagnie Generale (1959) 358 U.S. 625, 630 [3 L.Ed.2d 550, 554, 79 S.Ct. 406].)[5] That duty became operative when the passengers entered upon ancillary property (such as a dock, gangway, or loading platform) of the carrier (see Warner v. Baltimore & Ohio Railroad Co. (1897) 168 U.S. 339, 347 [42 L.Ed. 491, 496-497, 18 S.Ct. 68]; Mac Gregor v. Pacific Elec. Ry. Co. (1936) 6 Cal.2d 596, 600 [59 P.2d 123]) or otherwise "`placed [themselves] under the control of the carrier.'" (Orr v. Pacific Southwest Airlines, supra, 208 Cal. App.3d 1467 at p. 1473 [citing and quoting Grier v. Ferrant (1944) 62 Cal. App.2d 306, 310 (144 P.2d 631)].) A carrier has the duty "to take every reasonable precaution for the safety ... of its passengers in alighting from and boarding its [conveyances]." (Sellars v. Southern Pac. Co. (1917) 33 Cal. App. 701, 706 [166 P. 599].) The charter agreement specifies that the carrier would make a "passenger count ... at *1113 the gangway prior to departure." The existence of a special relationship between the carrier and the passengers prior to boarding and departure thus appears as an "inference[] reasonably deducible from the evidence." (Code Civ. Proc., § 437c, subd. (c).) As part of its duty of reasonable care the carrier was obligated "to protect its passengers from physical harm." (De Vera v. Long Beach Pub. Transportation Co. (1986) 180 Cal. App.3d 782, 793 [225 Cal. Rptr. 789]; Rest.2d Torts, § 314A, subd. (1)(a).)
Once the ship was underway, plaintiff contends defendant "owed... a duty to either provide medical services or access to them" or "emergency evacuation of injured patrons." Here too, the carrier already had the duty to provide injured passengers with care. (De Vera v. Long Beach Pub. Transportation Co., supra, 180 Cal. App.3d 782 at pp. 793-794; Rest.2d Torts, § 314A, subd. (1)(b).) The measures for which plaintiff argues could not have been unilaterally implemented by defendant; in the charter agreement defendant undertook "not to hire or employ any person(s) ... to perform services ... aboard the Vessel without [the] Owner's consent," and further accepted that the ship's captain would "be in complete control ... of the Vessel."[6]
It thus appears that the duty plaintiff would have us impose upon defendant is substantially identical to that already required of common carriers. In light of the preceding discussion, plaintiff's emphasis on "the degree of control which [defendant] exercised over the event and its patrons" is hyperbole, and her assertion that "the passengers were at [defendant's] mercy for the duration" of the trip is simply inaccurate. The passengers were not required to abandon all hope as they trooped up the gangway. Among the relevant considerations, both "the convenience of the rule" and a "social judgment as to where the loss should fall" (Weirum v. RKO General, Inc., supra, 15 Cal.3d 40 at p. 46) strongly militate against the duty for which plaintiff argues. There is little if any convenience in duplicating legal duties; the overlap could only confuse a system whose notable simplicity is founded upon easily comprehended common sense concepts of possession and control. That system already reflects a "social judgment as to where the loss should fall"  on the carrier. Nor is this a situation where an injured party is denied all recovery: the carrier settled for $150,000 and plaintiff obtained a large judgment against Clark. Thus, "the `wrongs and injuries involved were both comprehensible and assessable within the existing judicial *1114 framework.'" (Nally v. Grace Community Church, supra, 47 Cal.3d 278 at p. 298 [citing and quoting this court's decision in Peter W. v. San Francisco Unified Sch. Dist. (1976) 60 Cal. App.3d 814, 824 (131 Cal. Rptr. 854)].)
Nor do the other factors require finding a duty.
As to foreseeability, there is nothing in the record which gives the least indication that defendant had ever experienced an incident involving either a shooting or serious injury in operating its business. Defendant would therefore have no reason to anticipate such an incident, particularly in a changed setting. (Cf. Isaacs v. Huntington Memorial Hospital, supra, 38 Cal.3d 112 at pp. 124, 131.) This is even more true if specific attention is directed to what defendant knew or might be deemed to know of Clark. Defendant's owner, Myra Gaudet, testified at her deposition that she was aware that bartender Linda Tucker was a friend of Clark, and that Clark was a prison guard, but she did not know before the shooting that Clark was in the habit of carrying a firearm. Tucker's prior knowledge did not go beyond noticing that Clark carried a pistol on several dates. The factor of foreseeability is therefore against plaintiff. (See Southland Corp. v. Superior Court, supra, 203 Cal. App.3d 656 at pp. 668-669.)
Although "the degree of certainty that the plaintiff suffered injury" is virtually absolute, "the closeness of the connection between the defendant's conduct and the injury suffered" (Rowland v. Christian, supra, 69 Cal.2d 108 at p. 113) is much more tenuous. One difficulty is that the duty for which plaintiff now argues was at the time already imposed on the carrier. Just how adding defendant to the equation might lead to a different result is unclear. Suppose that in the processing of "screening" the passengers at boarding time, the presence of Clark's weapon was discovered. Suppose the further discovery that Clark, displaying no obvious signs that he was not in full possession of his faculties, tells the personnel doing the "screening" that he is entitled to carry the weapon. (See fn. 4, ante.) The decision would then be whether (1) to refuse Clark admission unless the pistol was surrendered (2) to admit him (3) to admit him with the admonition to be careful, or (4) to admit him with the admonition to be careful and after warning other passengers that a peace officer carrying a concealed weapon was on board.
Only the first of these options would have a substantial likelihood of averting the harm that eventually occurred. Because the ship belonged to the carrier, it would follow that the ultimate authority to determine who was allowed aboard also belonged to the carrier as concomitants of its ownership, its retention of the "burden of the ship" (Civ. Code, § 1959, quoted at fn. 6, ante), and its contractual responsibility to make the "passenger count." It would be unfair to give authority to the carrier, but *1115 liability to the charterer. The matter of warnings is not helpful to plaintiff. For a professional peace officer reasonably presumed to be conversant with the safe handling of firearms, a warning to be careful would be superfluous. Its efficacy in preventing accidental discharges would appear to be de minimis. A warning to other passengers would merit the same conclusion.
The duty to "screen" proffered by plaintiff holds scant prospect for success unless talk is accompanied by sterner measures. Suppose that Clark was asked whether he had a firearm on his person. Suppose further that he lied and said he did not. Would that be the end of the matter? Would he be allowed to board the ship or would his response then be verified? If the passenger is to be taken at his or her word, the duty to screen would amount to a largely meaningless gesture, useless against dishonesty. If verification is required, considerable passenger annoyance could be expected. On the other hand, suppose that the question-and-answer stage is bypassed, with passengers being screened as a matter of course, as occurs at airports. The installation of metal detectors may not be burdensome for locations such as train stations, bus depots, or dockside wharves. But plaintiff's logic is not limited to such obvious points of commerce: private social events would be within its sweep. Must the persons or organizations that engage banquet rooms in hotels or restaurants also make provision for detection either by device or by human ingenuity? If detection devices are not used, are hand bags to be searched and persons frisked? These few hypothetical permutations show that the costs would not only be financial; so would trust, privacy, and the civility of everyday life. And the obligation to make provision for medical care, particularly when another party is already under that responsibility, would be onerous. The "consequences to the community" (Rowland v. Christian, supra, 69 Cal.2d 108 at p. 113) would amount to a virtual reordering of civil society in the hope of preventing statistically insignificant incidents.
Accidents happen. Clark's handling of his weapon displayed an almost unbelievable stupidity. Defendant simply had the misfortune to charter the ship on which this freakish tragedy occurred. The current state of the law represents an established and sensible allocation of responsibility based upon the realities of social and commercial intercourse. (See Donnell v. California Western School of Law, supra, 200 Cal. App.3d 715 at p. 726.) We will not upset it.
Attempting to avoid this conclusion, plaintiff draws upon out-of-state authorities to bolster her argument that defendant should be deemed the functional equivalent of a tour operator or travel agent. The obvious motive for this tactic is to have an agent's fiduciary responsibilities to its principal (see McCollum v. Friendly Hills Travel Center (1985) 172 Cal. App.3d 83, *1116 91-94 [217 Cal. Rptr. 919]; Pollack v. Lytle (1981) 120 Cal. App.3d 931, 940 [175 Cal. Rptr. 81]) serve as the basis for a special relationship duty. Plaintiff's ploy must fail. (9) "[A] motion for summary judgment must be directed to the issues raised by the pleadings. The [papers] filed in response to a defendant's motion for summary judgment may not create issues outside the pleadings and are not a substitute for an amendment to the pleadings." (Saatzer v. Smith (1981) 122 Cal. App.3d 512, 520 [176 Cal. Rptr. 68] [citation omitted].) There is nothing in plaintiff's complaint  not even boilerplate allegations  that is in the least suggestive of an agency relationship between plaintiff and defendant. Accordingly, defendant "was not required to refute liability on some theoretical possibility not included in the pleadings." (IT Corp. v. Superior Court (1978) 83 Cal. App.3d 443, 452 [147 Cal. Rptr. 828].)
The summary judgment is affirmed.
Perley, J., and Reardon, J., concurred.
NOTES
[1] Clark was taken into custody by Berkeley police. He told them the gun had the safety off and a round in the chamber when it hit the deck, and that he threw the gun overboard before the ship docked. Further investigation proved that Clark had ingested cocaine and that his weapon was almost certainly cocked at the time. In large part because of this incident, Clark was subsequently placed on administrative leave, demoted, and discharged from the Department of Corrections.
[2] The caption of the complaint lists as plaintiffs "JEWELL NASH, individually, as wife and heir at law, and as personal representative of EUGENE NASH, decedent, and KEVIN NASH and JOYCE NASH, as son and daughter respectively, heirs at law of EUGENE NASH, decedent." The notice of appeal, however, was filed solely on behalf of Mrs. Nash, apparently in her individual capacity. For this reason and for purposes of simplicity, we shall hereinafter refer to Mrs. Nash as "plaintiff." In like vein, although recovery was sought from additional entities and individuals, we refer to the Fifth Amendment as "defendant" because it alone appeared in connection with the summary judgment and with this appeal.
[3] In California "[a]n inn is a house which is held out to the public as a place where all transient persons who come will be received and entertained as guests for compensation, ... a public house of entertainment for all who choose to visit it...." (Fay v. Pacific Improvement Co. (1892) 93 Cal. 253, 259 [28 P. 943]; accord Pinkerton v. Woodward (1867) 33 Cal. 557, 596.)
[4] Clark, as a species of peace officer, was entitled to carry a concealed weapon while not on duty. (See Pen. Code, §§ 830.5, subd. (c), 12031, subd. (b)(1).)
[5] Were this not a case where the shipper's duties are defined with reference to federal admiralty law (see Kermarec v. Compagnie Generale, supra, 358 U.S. 625 at p. 628 [3 L.Ed.2d 550 at p. 553]), California would impose "a duty of utmost care." (Acosta v. Southern Cal. Rapid Transit Dist. (1970) 2 Cal.3d 19, 27 [84 Cal. Rptr. 184, 465 P.2d 72]; accord Orr v. Pacific Southwest Airlines (1989) 208 Cal. App.3d 1467, 1472-1473 [257 Cal. Rptr. 18]; see Civ. Code, § 2100.)
[6] Civil Code section 1959 provides in pertinent part: "The contract by which a ship is let is termed a charter party. By it the owner may either let the capacity or burden of the ship, continuing the employment of the owner's master, crew, and equipments, or may surrender the entire ship to the charterer, who then provides them himself...." It is clear from the charter agreement that defendant hired only "the capacity ... of the ship," a conclusion fortified by the actions of the captain and crew after Mr. Nash was shot.