Opinion
 

 MASTERSON, J.
 

 Plaintiff Sondra S. Sutherland owned a condominium that sustained severe damage in an earthquake. Sutherland contacted her mortgage company, explained what had happened, and stated that she had to move out of the damaged unit and rent another residence. The mortgage company agreed to put a “stop” on her account for three months, during which time she did not have to make any payments. Sutherland believed that the “stop” period was intended to give her a financial break to deal with the
 
 *304
 
 unexpected costs of the earthquake. She thought that, at the end of the three-month period, her mortgage payments would resume in the regular amounts, thereby extending the life of the mortgage by three months.
 

 A week before the end of the “stop” period, the mortgage company informed Sutherland that her next scheduled payment had to include not only the regular monthly amount but also the sum of the three months’ payments not made during the “stop” period. Sutherland could not afford that sizable a payment, so she sent the mortgage company a check for one month only. The mortgage company returned the check as an improper partial payment and declared her in default.
 

 Sutherland filed this action against the mortgage company, alleging several causes of action and seeking declaratory and injunctive relief to prevent foreclosure on her home. The trial court granted summary judgment for the mortgage company. We conclude that some, but not all, of Sutherland’s causes of action raised triable issues of material fact. Accordingly, we reverse the summary judgment with directions to enter summary adjudication as to certain claims.
 

 Background
 

 In June 1992, Sutherland bought a condominium located at 18555 Collins Street, unit C-10, Tarzana, California (the property). The sales price was $105,000, not including closing costs, taxes, or other fees. Sutherland made a down payment of approximately $7,000 and financed the balance ($101,100) through Funders Mortgage Corporation of America (Funders). She executed a note and deed of trust in favor of Funders. As a condition of receiving the loan, Sutherland was required to obtain mortgage insurance from the United States Department of Housing and Urban Development (HUD).
 

 In July 1992, Funders transferred the loan to defendant Barclays American/Mortgage Corporation (Barclays) for servicing. At that time, the note and trust deed were assigned to Barclays. Sutherland made all of her loan payments on a timely basis through January 1994.
 

 On January 17,1994, an earthquake measuring 6.7 on the Richter scale hit about 2.5 miles from the property. The quake, commonly known as the Northridge earthquake, rendered Sutherland’s condominium uninhabitable,
 
 *305
 
 and she had to move out immediately and rent an apartment.
 
 [1]
 
 Damage to the condominium complex as a whole was estimated at several million dollars and necessitated major reconstruction and repairs.
 

 Three days after the earthquake, Sutherland telephoned Barclays and spoke with “David” in collections. She described the damage to the condominium and stated that she needed to move out and rent an apartment. David told her not to worry since Barclays would put a three-month “stop” on her account. He said that during the three-month period, no payments would be due, no notices would be sent to her about any delinquencies, and no derogatory information would be reported to any credit agencies. David also told Sutherland that she should call again if she needed more time before resuming her mortgage payments but that she should call in any event in order to let Barclays know about her status. In reliance on David’s representations, Sutherland did not make any mortgage payments for the months of February, March, or April 1994. Instead, she used that money for extraordinary expenses occasioned by the earthquake.
 

 On March 10, 1994, Sutherland wrote to Barclays, expressing an interest in “negotiat[ing] with you for a principal reduction, reduction of interest payments, and/or a more lengthy deferment of my mortgage payments.” On April 20, 1994, Greg Craig, a Barclays employee, called Sutherland and asked if she would be making her May payment. She explained that she was waiting for a response to her March 10 letter, and she reiterated her desire to further postpone her mortgage payments. Craig indicated that someone else from Barclays would contact her.
 

 Within a couple of days, Sutherland received a call from Bill Carter. He told her that Barclays expected her to make the February, March, and April payments together with the May payment or to make up the back payments within a short period of time.
 
 [2]
 
 Sutherland replied that she could not afford that large a payment and that she had expected the three payments to be added to the end of the loan period. She also stated that she would not have agreed to such a “balloon” payment since she had needed the mortgage money during the three-month “stop” period to cover expenses incurred as a result of the earthquake. Carter said that several other homeowners were also surprised by Barclays’s request for immediate repayment and that Barclays had not communicated its expectations to customers very well. Sutherland
 
 *306
 
 asked Carter why Barclays could not add the payments to the end of the loan period, and he indicated that only HUD had authority to do so. He stated that HUD could probably arrange for Sutherland to have minimal monthly payments (i.e., $200 to $300) for two to three years and that he would get back to her on that subject.
 
 [3]
 

 On May 4, 1994, Sutherland talked to Carter, and he again indicated that he would contact HUD about her mortgage. He also stated that he would send Sutherland a HUD form for her to complete. In light of Carter’s statements, Sutherland did not send Barclays her May payment during the 15-day grace period.
 
 [4]
 

 Instead of hearing from Carter, Sutherland received a letter dated May 12, 1994, which stated: “Your situation is serious!! You could lose your home!! [¶ The mortgage payments for the months of 2-1-94 thru 5-1-94 are due. A total of $2,935.52 is owed in back payments and late charges. Unless this amount is paid immediately or a plan for repayment is arranged, we will begin foreclosure of the mortgage and you may lose your home. [¶ However, ... the Department of Housing and Urban Development (HUD) may be able to help you. [¶ HUD may be able to accept an assignment of your mortgage. If HUD accepts an assignment, HUD would become your mortgagee. You would then make your mortgage payments to HUD and HUD would work with you in an effort to help you keep your home. [¶ ... [¶ We are enclosing a copy of HUD-92068F, request for financial information. Although it is voluntary on your part to furnish the information, failure to provide the information may cause you to lose your home. . . .” The letter further indicated that the completed HUD form should be returned to Barclays. With the sending of this letter, Barclays declared Sutherland to be in default based on her failure to make the payments for February, March, and April 1994.
 
 [5]
 

 On May 24, 1994, Sutherland sent a letter to Barclays explaining her prior communications with company employees and stating her belief that Bar-clays was acting improperly by demanding that she make an immediate lump
 
 *307
 
 sum payment covering the three-month “stop” period. With the letter, she forwarded the completed financial information form for HUD. In addition, she sent Barclays her May payment, by check dated May 23, 1994 (for the regular monthly amount of $721.91), together with the May 1994 payment coupon. In her May 24 letter, Sutherland stated: “I have sent you my May payment and will be sending my June payment shortly.”
 

 Barclays considered the check for the May payment to be a “partial” payment because it did not include the amount for the three-month “stop” period. Unwilling to accept a “partial” payment, Barclays returned the check to Sutherland uncashed. By letter dated June 24, 1994, Barclays informed Sutherland that “we cannot help you anymore in trying to save your home. [¶ We have decided that your case meets the Department of Housing and Urban Development’s (HUD) standards for acceptance of an assignment. Therefore we will ask HUD to consider acceptance of assignment of your mortgage from us. [¶ ... If HUD accepts the assignment, HUD will become your mortgagee and you may be able to keep your home. HUD will work out a payment plan that may help you catch up on your back payments.
 
 You do not need to do anything right now.
 
 HUD will write to you soon. . . .” (Italics added.)
 

 Over the next several months, HUD requested additional information from Sutherland. Each time, she promptly complied. On December 10, 1994, Sutherland spoke with Walter Jackson, an employee of HUD. He told her that she did not qualify for HUD’s loan assignment program because the reasons for the default on her loan were the earthquake and Barclays’s misleading conduct in declaring a default. Jackson explained that HUD had decided as a policy matter not to take over loans on properties damaged in the earthquake since the agency would then be “stuck with a bunch of damaged properties.” When Sutherland told Jackson that Barclays had falsely declared her account to be in default, he responded that disputes of that nature had to be resolved between the mortgage company and the borrower.
 

 Because Jackson had indicated that HUD would not take over her loan, Sutherland attempted to resume her mortgage payments. She wrote to Bar-clays on January 14, 1995, stating: “I am trying one more time to submit my monthly payment as a show of good faith; a check for $768.96 representing the January 1995 payment is enclosed.” In response, by letter dated January 27, 1995, Barclays returned the check uncashed, explaining: “As you are aware, your account is currently due the February, 1994 mortgage payment and is under review by the Department of Housing and Urban Development for [assignment of your mortgage.”
 

 
 *308
 
 On January 31, 1995, HUD informed Barclays by letter that it was returning the assignment request on Sutherland’s loan. The letter also advised: “According to our records, this condominium was damaged as a result of the Northridge earthquake. Please enter into a forbearance agreement with the mortgagor until the property is fully repaired. Please notify us when the property is fully repaired so that we may then re-evaluate the mortgagor’s eligibility for the assignment program.” A copy of the letter was sent to Sutherland.
 

 On February 9, 1995, Sutherland spoke to Carter at Barclays about a possible forbearance agreement. Sutherland wanted to know if such an agreement would be a “true” forbearance, i.e., an agreement suspending payments while it was in effect and adding them to the end of the loan period. Carter responded that a forbearance agreement would merely prevent Barclays from foreclosing until the property was fully repaired; it would not add the payments to the end of the loan period or permit Sutherland to resume regular monthly payments in the event HUD declined an assignment request.
 

 As of March 1, 1995, Sutherland had not received a proposed forbearance agreement. On that day, she filed this action against Funders (the original mortgagee) and Barclays. By letter dated March 15, 1995, Barclays informed Sutherland that, effective April 1, 1995, Norwest Mortgage, Inc. (Norwest), would begin servicing her loan. Sutherland then brought Norwest into the litigation as a Doe defendant.
 
 [6]
 
 Sutherland dismissed Funders from the action because it had brokered the loan to Barclays in 1992, long before her loan problems began.
 

 The complaint alleged seven causes of action. The first, for declaratory relief, sought a declaration that Sutherland was not in default under the note or deed of trust. The second, for breach of contract, alleged that Barclays had wrongfully refused to accept her mortgage payments beginning in May 1994 and had breached the three-month “stop” payment agreement by declaring her in default. The third cause of action alleged a breach of the covenant of good faith and fair dealing. In the fourth cause of action, Sutherland alleged that Barclays had negligently misrepresented the terms of the “stop” payment agreement, knowing that it would later demand that she make a lump-sum payment covering those three months. The fifth cause of action alleged that Barclays had denied the existence of the “stop” payment agreement in bad faith. The sixth cause of action sought damages for negligent infliction
 
 *309
 
 of emotional distress. Finally, the seventh cause of action sought injunctive relief to preclude Barclays from foreclosing on the property.
 

 In January 1996, Barclays filed a motion for summary judgment or, in the alternative, for summary adjudication of issues as to each cause of action. After full briefing and oral argument, the trial court granted the motion for summary judgment. The trial court reasoned that Barclays had fully complied with the three-month “stop” payment agreement and that, in any event, since the agreement was not in writing, Barclays could foreclose on the property under the written terms of the note and deed of trust. Judgment was entered in favor of Barclays and Norwest. Sutherland filed a timely notice of appeal.
 

 Discussion
 

 Summary judgment is appropriate if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)
 

 “A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . Once the defendant’s burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. ... In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. . . . In making this determination, the moving party’s affidavits are strictly construed while those of the opposing party are liberally construed.”
 
 (Hanooka
 
 v.
 
 Pivko
 
 (1994) 22 Cal.App.4th 1553, 1558 [28 Cal.Rptr.2d 70], citations omitted; see also Code Civ. Proc., § 437c, subd. (o)(2).) We accept as undisputed facts only those portions of the moving party’s evidence that are not contradicted by the opposing party’s evidence.
 
 (Kelleher
 
 v.
 
 Empresa Hondurena de Vapores, S.A.
 
 (1976) 57 Cal.App.3d 52, 56 [129 Cal.Rptr. 32].) In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true. (See
 
 Zeilman
 
 v.
 
 County of Kern
 
 (1985) 168 Cal.App.3d 1174, 1179, fn. 3 [214 Cal.Rptr. 746].)
 

 A.
 
 Declaratory Relief and Breach of Contract
 

 Sutherland’s request for declaratory relief (to the effect that she is not in default) and her breach of contract claim both rest on the same theory:
 
 *310
 
 the three-month “stop” payment agreement excused her payments in February, March, and April 1994 and allowed her to resume
 
 regular
 
 monthly payments in May 1994. Thus, according to Sutherland, the “stop” payment agreement extended the life of the mortgage by adding the excused payments to the end of the loan period.
 

 In moving for summary judgment, Barclays argued that it had fully performed the oral agreement since it had not
 
 expressly
 
 stated that the three payments would be added to the end of the loan period. Alternatively, Barclays asserted that the oral agreement, regardless of its terms, could not modify the written provisions of the note and deed of trust, which authorized Barclays to declare Sutherland in default. We conclude that neither argument entitled Barclays to judgment as a matter of law.
 

 1.
 
 The Interpretation of the Oral Agreement
 

 Barclays contends that it complied with all terms of the three-month “stop” payment agreement by allowing Sutherland to skip three payments, by not sending delinquency notices to her during that period, and by not reporting her to credit agencies. As Barclays sees it, the agreement to put a three-month “stop” on Sutherland’s account meant that, as a matter of law, she owed four months’ payments at the end of the “stop” period. We do not see it that way.
 

 “A contract may be explained by reference to the circumstances under which it is made, and the matter to which it relates.” (Civ. Code, § 1647.) Further, where the terms of an agreement are ambiguous, they “should be interpreted most strongly against the party who caused the uncertainty to exist.”
 
 (Id.,
 
 § 1654.) Finally, “when different constructions of a provision are otherwise equally proper, that is to be taken which is most favorable to the party in whose favor the provision was made.” (Code Civ. Proc., § 1864.)
 

 Barclays agreed to put a three-month “stop” on Sutherland’s account because of the financial crisis she was facing as a result of the Northridge earthquake. Sutherland informed Barclays that she had to move out of the condominium and rent another place. She requested a break in the mortgage payments precisely because she needed the money for other expenses—those occasioned by the earthquake. Arguably, Barclays should have understood the purpose of Sutherland’s request; if an earthquake victim needs immediate relief from her loan payments, it does little good to require that the excused payments be made three months later in a lump sum. Barclays’s interpretation of the “stop” payment agreement would not free up the money for other purposes. For that reason, it is understandable that Barclays’s other
 
 *311
 
 customers also expressed surprise when told of its demand for a lump-sum payment at the end of the “stop” period. Nor is Barclays’s position advanced by Carter’s admission that the company had not effectively communicated its intentions to customers. Indeed, Sutherland’s other creditors agreed to put a temporary hold on her accounts, with
 
 regular
 
 payments to resume at the end of the moratorium. (See fn. 3,
 
 ante.)
 
 Only Barclays insisted on a “balloon” payment three months after the earthquake.
 

 Even if we ignore the circumstances surrounding the parties’ oral agreement, we cannot conclude that an agreement to “stop” a loan account for three months means that, as a matter of law, the excused payments will all be due in the fourth month. A mortgagee’s statement that it will temporarily “stop” an account does not indicate with reasonable certainty when the excused payments have to be made. Such a statement is ambiguous and should arguably be construed in favor of the borrower. (See Civ. Code, § 1654.) Moreover, to the extent the parties’ competing interpretations of the “stop” payment agreement are equally plausible, the agreement should be interpreted in favor of the borrower, since it was for her benefit that the agreement was made. (See Code Civ. Proc., § 1864.)
 
 [7]
 

 2.
 
 Oral Modification of a Written Agreement
 

 Barclays contends that an oral modification of the note and deed of trust is unenforceable as a matter of law. According to Barclays, a valid modification had to be in writing. Under this reasoning, even if Barclays had told Sutherland that she could skip three payments and that they would be added to the end of the loan period, it could have declared her in default for missing any of those payments. This position is without merit.
 

 As our Supreme Court stated more than 70 years ago: “ It would certainly be unreasonable to hold . . . that the defendant can now insist upon a forfeiture of the contract on account of the failure to make such payments. “We know of no principle of law . . . which will permit a party to a contract, who is entitled to demand the performance by the other party of some act within a specified time, and who has consented to the postponement of the performance to a time subsequent to that fixed by the contract, and where the other party has acted upon such consent, and in reliance thereon has permitted the contract time to pass without performance, to subsequently recall such consent and treat the non-performance within the
 
 *312
 
 original time as a breach of the contract.” . . .’ [¶ . . . [W]here the conduct or the acts of the party whose rights would thus be affected by a waiver have been such as to mislead the other party, to his prejudice, into the honest belief that a waiver was intended or consented to, then such conduct or acts will be held sufficient to work an estoppel as against the former.”
 
 (Johnson
 
 v.
 
 Kaeser
 
 (1925) 196 Cal. 686, 697-698 [239 P. 324].)
 

 We recognize that “[i]n
 
 the absence of consideration,
 
 a gratuitous oral promise to postpone a sale of property pursuant to the terms of a trust deed ordinarily would be unenforceable under [Civil Code] section 1698.”
 
 (Raedeke
 
 v.
 
 Gibraltar Sav. & Loan Assn.
 
 (1974) 10 Cal.3d 665, 673 [111 Cal.Rptr. 693, 517 P.2d 1157], italics added.) The same holds true for an oral promise to allow the postponement of mortgage payments.
 
 (California Securities Co.
 
 v.
 
 Grosse
 
 (1935) 3 Cal.2d 732, 733 [46 P.2d 170], applying Civil Code section 1698.) However, “. . . the doctrine of promissory estoppel is used to provide a substitute for the consideration which ordinarily is required to create an enforceable promise. . . . ‘The purpose of this doctrine is to make a promise binding, under certain circumstances, without consideration in the usual sense of something bargained for and given in exchange. . .
 
 (Raedeke, supra,
 
 10 Cal.3d at p. 672.) “ ‘Under this doctrine a promisor is bound when he should reasonably expect a substantial change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement. . . .’ ”
 
 (Id.
 
 at p. 672, fn. 1; accord, 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 248, 322-323, pp. 249-251, 302-304.)
 
 [8]
 

 Here, Sutherland relied to her detriment on Barclays’s statement that she could postpone three mortgage payments. Having orally agreed to such a postponement, Barclays cannot rely on the absence of a
 
 written
 
 agreement in order to declare Sutherland in default for missing those payments.
 

 3.
 
 Sutherland’s Failure to Make Payments After the “Stop” Period
 

 Putting aside the question of when the three excused payments were due, Barclays maintains that Sutherland nevertheless defaulted on the loan by
 
 *313
 
 failing to make her
 
 regular
 
 payments after the three-month “stop” period. We disagree.
 

 The “stop” period expired at the end of April 1994. Thus, Sutherland had to commence making regular monthly payments in May 1994. She did so. On May 24, 1994, Sutherland mailed Barclays a check for $721.91 together with the May payment coupon. However, Barclays returned the check uncashed because Sutherland had not included the amounts for the three months covered by the “stop” period. Barclays viewed the check as an improper “partial” payment. Then, in June, Barclays informed Sutherland that HUD was considering whether to take over her loan and that, in the meantime, “[y]ou do not need to do anything.” When a HUD official told Sutherland in December 1994 that the agency would not take over her loan, she again sent a check in the monthly amount to Barclays. The company also returned that check uncashed, stating that Sutherland still needed to make the February 1994 payment.
 

 These events preclude a determination on summary judgment that Sutherland defaulted on the loan after the “stop” period. Beginning in May 1994, Barclays made clear that it would not accept a check in the regular monthly amount unless Sutherland first paid the amounts for the three-month “stop” period. It returned her monthly checks for May 1994 and January 1995. Moreover, it declared her in default on May 12, 1994, for failure to pay for the preceding three months. Finally, Barclays’s letter concerning the HUD assignment program suggested that Sutherland did not need to make payments while the agency considered whether to take over her loan.
 

 In these circumstances, we cannot say that, as a matter of law, Sutherland was obligated to continue making regular monthly payments after May 1994. Surely, Barclays would have returned them. The law did not require Sutherland to engage in futile or useless acts. (See Civ. Code, § 3532.) Having returned Sutherland’s May 1994 payment, informed her that such “partial” payments would not be accepted, and declared her in default on May 12, 1994, Barclays can hardly maintain that Sutherland should have been making regular payments after the three-month “stop” period.
 

 Accordingly, Barclays was not entitled to judgment on the causes of action for declaratory relief and breach of contract.
 

 B.
 
 Covenant of Good Faith and Fair Dealing
 

 In the complaint, Sutherland alleged that Barclays breached the covenant of good faith and fair dealing implied in the three-month “stop”
 
 *314
 
 agreement. On appeal, the parties focus on whether a breach of the covenant permits a recovery in tort. We conclude that, while the covenant is part of the agreement, it does not provide a basis for tort relief.
 

 “ ‘ “Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.” . . . This duty has been recognized in the majority of American jurisdictions, the Restatement, and the Uniform Commercial Code. [¶ The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith.”
 
 (Carma Developers (Cal.), Inc.
 
 v.
 
 Marathon Development California, Inc.
 
 (1992) 2 Cal.4th 342, 371-372 [6 Cal.Rptr.2d 467, 826 P.2d 710], citations omitted.) In general, the covenant imposes a duty upon a party to a contract not to deprive the other party of the benefits of the contract.
 
 (Floystrup
 
 v.
 
 City of Berkeley Rent Stabilization Bd.
 
 (1990) 219 Cal.App.3d 1309, 1318 [268 CaLRptr. 898].) The covenant “ ‘. . . not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose.’ ”
 
 (Ibid.)
 

 Nevertheless, although the covenant is implied into every contract, its breach does not constitute a tort in the present context. The “general rule preclud[es] tort recovery for noninsurance contract breach, at least in the absence of violation of ‘an independent duty arising from principles of tort law.’ ”
 
 (Freeman & Mills, Inc.
 
 v.
 
 Belcher Oil Co.
 
 (1995) 11 Cal.4th 85, 102 [44 Cal.Rptr.2d 420, 900 P.2d 669].) As stated by one Court of Appeal, “. . . it seems clear to us that the recognition of a tort remedy for a breach of the implied covenant in a noninsurance contract has little authoritative support.”
 
 (Careau & Co.
 
 v.
 
 Security Pacific Business Credit, Inc.
 
 (1990) 222 Cal.App.3d 1371, 1399 [272 Cal.Rptr. 387].)
 

 Thus, Sutherland is limited to contract remedies on her claim for breach of the covenant.
 

 C.
 
 Negligent Misrepresentation
 

 In the complaint, Sutherland alleged that Barclays had represented that it would put a three-month “stop” on her account (and thereby postpone the excused payments to the end of the loan period) when, in fact, it intended all along to demand that the payments be made four months later.
 

 In moving for summary adjudication as to the negligent misrepresentation claim, Barclays argued that it had complied with the terms of the three-month “stop” agreement, i.e., it had not made any misrepresentations since
 
 *315
 
 the oral agreement required that Sutherland make the excused payments in a lump sum at the end of the “stop” period.
 

 We have already held that the trier of fact must determine when the excused payments were to be made—either at the end of the “stop” payment period (as Barclays contends) or at the end of the loan period (as Sutherland contends). Plainly, the evidence submitted by Sutherland was sufficient to create a triable issue of fact as to whether Barclays misrepresented the terms of the “stop” payment agreement. Consequently, Barclays is not entitled to summary adjudication on the negligent misrepresentation claim.
 

 D.
 
 Bad Faith Denial of Existence of Contract
 

 In
 
 Seaman’s Direct Buying Service, Inc.
 
 v.
 
 Standard Oil Co.
 
 (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158], the Supreme Court “recognize[d] that a party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists.”
 
 (Id.
 
 at p. 769.) Sutherland seeks to maintain a cause of action under
 
 Seaman’s.
 
 For two reasons, she cannot do so.
 

 First, Barclays did not deny the existence of the “stop” payment agreement in bad faith or at all. The parties essentially agree on what was said. They disagree on the meaning of the words used. However, “[disputes as to the terms of a contract or the meaning or legal effect of those terms do not constitute a denial of contract existence.”
 
 (DuBarry Intenat., Inc.
 
 v.
 
 Southwest Forest Industries, Inc.
 
 (1991) 231 Cal.App.3d 552, 567 [282 Cal.Rptr. 181].)
 

 Second, in
 
 Freeman & Mills, Inc.
 
 v.
 
 Belcher Oil Co., supra,
 
 11 Cal.4th 85, the Supreme Court overruled
 
 Seaman’s
 
 approximately five months after Sutherland filed her complaint. “The general rule that judicial decisions are given retroactive effect is basic in our legal tradition.”
 
 (Newman
 
 v.
 
 Emerson Radio Corp.
 
 (1989) 48 Cal.3d 973, 978 [258 Cal.Rptr. 592, 772 P.2d 1059].) Of course, a narrow exception to the general rule exists “when considerations of fairness and public policy are so compelling in a particular case that, on balance, they outweigh the considerations that underlie the basic rule.”
 
 (Id.
 
 at p. 983.) However, we see no reason why the exception to retroactivity should apply here.
 

 In this case, neither fairness nor public policy warrants a departure from the general rule. As to fairness, the courts place great weight upon “ ‘. . . the ability of litigants to foresee coming change in the law . . . .’ ”
 
 (Newman
 
 v.
 
 Emerson Radio Corp., supra,
 
 48 Cal.3d at p. 985.) Here, the demise
 
 *316
 
 of
 
 Seaman’s
 
 was foreseeable long before it was overruled. In
 
 Freeman & Mills,
 
 the high court pointed out that
 
 Seaman’s
 
 had been undermined by a series of its own decisions beginning in 1988 with
 
 Foley
 
 v.
 
 Interactive Data Corp.
 
 (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373].
 
 (Freeman & Mills Inc.,
 
 v.
 
 Belcher Oil Co., supra,
 
 11 Cal.4th at pp. 93-95.) The court further explained that
 
 Seaman’s
 
 had been frequently criticized over the years by the Courts of Appeal, the courts of other jurisdictions, and scholarly commentators.
 
 (Id.
 
 at pp. 95-102.) Moreover, the Supreme Court granted review in
 
 Freeman & Mills
 
 more than two months before Sutherland filed this action. In light of these factors, the retroactive application of
 
 Freeman & Mills
 
 to this case will not frustrate “the reasonable reliance of the parties on the previously existing state of the law.”
 
 (Newman, supra,
 
 48 Cal.3d at p. 983.)
 

 As to the public policy factors supporting retroactive application of
 
 Freeman & Mills,
 
 we agree with the analysis of
 
 Norager
 
 v.
 
 Nakamura
 
 (1996) 42 Cal.App.4th 1817 [50 Cal.Rptr.2d 481]: “Nor do we find any public policy reasons why we should give any continuing effect to
 
 Seaman’s
 
 in a case such as this one, which is still undergoing appellate review. The Supreme Court made abundantly clear its belief that
 
 Seaman’s
 
 ‘was incorrectly decided, that it has generated unnecessary confusion, costly litigation, and inequitable results, and that it will continue to produce such effects unless and until we overrule it.’ ”
 
 (Id.
 
 at p. 1821, quoting
 
 Freeman & Mills Inc.,
 
 v.
 
 Belcher Oil Co., supra,
 
 11 Cal.4th at p. 93.)
 

 Accordingly, the trial court properly adjudicated the
 
 Seaman’s
 
 cause of action in Barclays’s favor.
 

 E.
 
 Negligent Infliction of Emotional Distress
 

 Sutherland’s negligent infliction claim alleged that Barclays was “incompetent” and “inept” in handling her request for a payment moratorium after the earthquake. She complains that she had to deal with multiple representatives of Barclays, was asked to submit the same materials on more than one occasion, received the wrong form letters, was “harassed” to make payments she did not owe, and was improperly threatened with foreclosure.
 

 At most, the negligent infliction claim alleges that Barclays mistreated Sutherland in breaching the three-month “stop” payment agreement. However, there is no duty, sounding in tort, that requires a breach of contract to be accomplished in a polite or administratively efficient manner. Sutherland’s allegations of “mistreatment” do not change the fundamental nature of
 
 *317
 
 her negligent infliction claim; it remains a breach of contract claim. As such, it does not permit a recovery of damages for emotional distress.
 
 (See Applied Equipment Corp.
 
 v.
 
 Litton Saudi Arabia Ltd.
 
 (1994) 7 Cal.4th 503, 514-516 [28 Cal.Rptr.2d 475, 869 P.2d 454].)
 
 [9]
 
 Thus, summary adjudication was proper as to the negligent infliction claim.
 

 F.
 
 Request for Injunctive Relief
 

 The complaint contained a request for an injunction to prevent Barclays from foreclosing on Sutherland’s property. In granting summary judgment, the trial court found that the request for injunctive relief was moot because all of Sutherland’s other causes of action—on which an injunction would have been based—were without merit. Since we have held that some of those causes of action were improperly dismissed, it follows that the request for injunctive relief is no longer moot. Consequently, this claim must be reinstated.
 

 G.
 
 Public Policy Claim
 

 Sutherland argues that we should recognize a new cause of action where a mortgagee falsely declares a mortgagor to be in default with the intent of assigning the loan to HUD and collecting on federal mortgage insurance. According to Sutherland, the mortgagee in that situation is attempting to defraud the federal government.
 

 We decline to address this contention since it was raised for the first time on appeal. The complaint did not plead such a theory of liability, and the issue was not addressed during the summary judgment proceedings. It is well established that “ ‘ [a] motion for summary judgment must be directed to the issues raised by the pleadings. The [papers] filed in response to a defendant’s motion for summary judgment may not create issues outside the pleadings and are not a substitute for an amendment to the pleadings.’ . . . [A] defendant ‘[is] not required to refute liability on some theoretical possibility not included in the pleadings.’ ”
 
 (Nash
 
 v.
 
 Fifth Amendment
 
 (1991) 228 Cal.App.3d 1106, 1116 [279 Cal.Rptr. 465], citation omitted.)
 

 
 *318
 
 If she so desires, Sutherland can raise this point in an appropriate manner on remand.
 
 [10]
 

 Disposition
 

 The judgment is reversed. The trial court is directed to grant defendants’ alternative motion for summary adjudication with respect to the fifth cause of action (bad faith denial of existence of contract), the sixth cause of action (negligent infliction of emotional distress), and the claim for tort relief on the third cause of action (breach of the covenant of good faith and fair dealing) and to deny the motion for summary judgment/summary adjudication in all other respects. Plaintiff is entitled to costs on appeal.
 

 Spencer, P. J., and Ortega, J., concurred.
 

 On March 28, 1997, the opinion was modified to read as printed above.
 

 [1]
 

 In the aftermath of the quake, the value of the condominium dropped from around $109,000 to approximately $51,000.
 

 [2]
 

 According to Carter, Sutherland needed to pay approximately $2,887 in May instead of her usual monthly payment of $721.91.
 

 [3]
 

 Sutherland requested and received payment moratoriums from other creditors, including Santa Monica Bank and most of her credit card companies. Each of those creditors added the excused payments to the end of the loan period and allowed Sutherland to resume regular monthly payments at the end of the moratorium.
 

 [4]
 

 Although Sutherland’s monthly payments were “due” on the first day of each month, she had a 15-day grace period during which no late charge would apply. After the grace period, Barclays could assess a late charge equal to 4 percent of the overdue amount. If Sutherland failed to make a payment by the end of the month, Barclays could declare her in default.
 

 [5]
 

 Barclays could not declare a default as to the May payment since Sutherland had until the end of the month to make it (albeit with a late charge if the payment was received after May 15). (See fn. 4,
 
 ante.)
 

 [6]
 

 Since it appears that Norwest is Barclays’s assignee, we will simply refer to them collectively as Barclays.
 

 [7]
 

 We are not suggesting that the “stop” payment agreement should be construed in Sutherland’s favor as a matter of law. Based on the record before us, we conclude that the interpretation of the agreement presents a question to be resolved by the trier of fact.
 

 [8]
 

 When
 
 Raedeke
 
 and
 
 California Securities Co.
 
 were decided, Civil Code section 1698 provided in its entirety: “A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise.” (Amends, to Codes 1873-1874, ch. 612, § 193, p. 243.) In 1976, a new section 1698 was enacted which states in part: “A contract in writing may be modified by a contract in writing . . . [or] by an oral agreement to the extent that the oral agreement is executed by the parties. . . .
 
 Nothing in this section precludes in an appropriate case the application of rules of law concerning estoppel
 
 . . . .” (Civ. Code, § 1698, subds. (a), (b) & (d), added by Stats. 1976, ch. 109, § 4, p. 171, italics added.)
 

 [9]
 

 Sutherland attempts to save her negligent infliction claim by relying on authorities concerning a claim for
 
 intentional
 
 infliction of emotional distress. The elements of those two causes of action are quite different. (See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 403-406, pp. 483-487; 6 Witkin,
 
 op. cit. supra,
 
 Torts, § 838, pp. 194-195.) Because Sutherland has not pleaded an intentional infliction claim, her authorities are inapposite.
 

 [10]
 

 Similarly, we decline Sutherland’s request to order the trial court to (1) reinstate her preferential trial date, (2) reschedule a hearing on her motion for discovery sanctions, and (3) impose sanctions on defendants and their counsel for alleged improper conduct in connection with the summary judgment motion and related proceedings. These matters can be pursued on remand.