Robie, J.
*283 "As authorized by Congress, the United States Department of the Treasury implemented the Home Affordable Mortgage Program (HAMP) to help homeowners avoid foreclosure during the housing market crisis of 2008. 'The goal of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by *284 reducing mortgage payments to sustainable levels, without discharging any of the underlying debt.' " ( West v. JPMorgan Chase Bank, N.A. (2013) 214 Cal.App.4th 780, 785, 154 Cal.Rptr.3d 285.)
In this case, plaintiff Gregory Moore contacted defendant Wells Fargo, N.A. (Wells Fargo)[1] to discuss possible assistance *783 programs while he was unemployed. Wells Fargo recommended the forbearance plan (Plan) under the Home Affordable Unemployment Program (Unemployment Program) outlined in the United States Department of the Treasury's HAMP supplemental directive 10-04 dated May 11, 2010 (Directive 10-04). Wells Fargo explained the Plan would allow Moore to make reduced monthly payments for a period of time and said there was "no downside" to the Plan -- if Moore qualified for a permanent loan modification at the conclusion of the Plan, the arrears would be added to the modified loan balance and, if Moore did not qualify for a permanent loan modification, he would return to making his normal monthly payments.
Moore applied for and was accepted to participate in the Plan. When he received the approval letter, entitled Unemployment Program Forbearance Plan Notice (Notice), Moore confirmed the Notice said the reduced monthly payments would be made "in place of" and "instead of" his normal monthly payments. Moore made the Plan payments and later applied for a permanent loan modification.
Three days after receiving a denial of his permanent loan modification application, Moore received a letter from Wells Fargo stating he was in default on his loan, demanding immediate payment of his normal mortgage payment and the arrears consisting principally of the difference between his normal mortgage payments and the reduced Plan payments (i.e., a balloon payment), and threatening foreclosure. Moore sued to stop the foreclosure and asserted the following causes of action: (1) declaratory relief; (2) negligence; (3) breach of the covenant of good faith and fair dealing; (4) fraud; and (5) violation of Business and Professions Code section 17200, the unfair competition law.[2]
In pretrial rulings, the trial court, among other things, adjudicated Moore's declaratory relief cause of action in favor of Wells Fargo's contractual *285 interpretation permitting it to demand the balloon payment and dismissed Moore's negligence cause of action in response to Wells Fargo's motion for judgment on the pleadings. The case then proceeded to a jury trial.
After Moore rested his case at trial, the trial court granted Wells Fargo's motion for nonsuit as to Moore's breach of the implied covenant of good faith and fair dealing cause of action. The trial court further granted Wells Fargo's motion for judgment notwithstanding the verdict after the jury found Wells Fargo had committed fraud. The trial court also adjudicated the unfair competition law cause of action posttrial, finding in favor of Wells Fargo, and granted Wells Fargo's motion for costs and attorney fees.
On appeal, Moore challenges the foregoing pretrial and posttrial rulings. We reverse.
THE GENERAL ALLEGATIONS
We provide a summary of the pertinent general allegations in the third amended complaint here as background and include the detailed factual background pertaining to each issue (including the trial evidence) in the applicable portion of the Discussion.
Moore purchased his home in 1995 with a home loan by World Savings & Loan; he refinanced the loan with the same lender *784 in 2004. World Savings & Loan was subsequently acquired by or merged with Wachovia Bank, which, in turn, was later acquired by or merged with Wells Fargo.
In or about April 2009, Moore lost his job. Moore argued he continued making his full mortgage payments through October 2010.[3] In or about October 2010, anticipating difficulty in continuing to make full mortgage payments, Moore called Wells Fargo to discuss recommendations for financial relief until he became reemployed.
A Wells Fargo representative described and recommended the Plan under HAMP's Unemployment Program. Moore provided the necessary financial and personal information, and, in approximately October 2010, Moore received an approval letter from Wells Fargo outlining the terms and conditions of the Plan. Under the Plan, Moore's monthly payments were reduced from approximately $2,500 to $599.42. Moore "did not undertake alternative financial remedies he could have pursued including but not limited to: the seeking of alternative sources of financing; increasing his income with the *286 taking-on of renters; the listing and sale of his residence; or filing for bankruptcy, because of the representations made to him by [Wells Fargo] about the Plan."
During phone calls with Wells Fargo, Moore inquired into the likely benefits or liabilities upon completion of the Plan. Based on those conversations, Moore "understood that if he remained in compliance with the Plan requirements, he would likely be approved for a modified loan upon completion of the Plan. At no time [when he applied for the Plan or] during [the monthly] phone calls or in any discussion with any [Wells Fargo] employee prior to March 2, 2011 was [Moore] advised that he would be responsible for immediate repayment of the difference between the Plan's forbearance payments and the financially greater, pre-forbearance mortgage payments, i.e. a 'balloon' payment." Moore also received no written notice regarding the balloon payment requirement. Rather, in response to his inquiries, Wells Fargo repeatedly assured Moore that he would not incur any additional liabilities under the Plan.
Moore made the six Plan payments and three agreed-upon additional payments through extension of the Plan. In August 2011, however, Wells Fargo refused to accept another reduced Plan payment and advised Moore he was liable for immediate payment of his normal full mortgage payment and the arrears of $19,000, consisting of the difference between his full mortgage payments and the reduced Plan payments plus fees and penalties. Wells Fargo considered Moore's Plan payments to constitute a default under the loan, and had reported the Plan payments as such to the credit reporting bureaus.
Moore advised Wells Fargo that payment of the $19,000 would constitute a financial hardship; Wells Fargo responded his failure to pay the amount would result in commencement of foreclosure proceedings. It further said any payment made "would be applied to the payment most in 'arrears', namely the payment due November, 2010, the month in which the Plan had begun." Moore received a notice of default and election to sell in March 2012, and a notice of sale in June 2012.
Moore filed suit to avoid the foreclosure and asserted various causes of action. The trial court issued a restraining order precluding a trustee sale during the pendency of the litigation.
*785 *287 DISCUSSION
I
Contract Claims
Moore's contract-based claims -- as set forth in his declaratory relief and breach of the implied covenant of good faith and fair dealing causes of action -- are grounded in the premise that the Notice modified the loan's deed of trust and note; a premise not challenged or disputed by Wells Fargo. Indeed, Wells Fargo agrees the Notice must be read in conjunction with the deed of trust and note to understand the parties' respective rights, duties, and obligations, and asserted in the trial court that the Notice modified the note and deed of trust. The Notice, deed of trust, and note are collectively referred to as contract documents.
The principal dispute between the parties is whether Wells Fargo could, pursuant to the contract documents, deem Moore in default and, accordingly, demand a balloon payment at the end of the Plan term, as it did. The trial court found the terms of the contract documents unambiguous in favor of Wells Fargo's interpretation.
The trial court's ruling on the threshold question of ambiguity "is a question of law subject to our independent review." ( Curry v. Moody (1995) 40 Cal.App.4th 1547, 1552, 48 Cal.Rptr.2d 627.) We do not read the contract documents the same way as the trial court; we find them ambiguous.
A
Contract Interpretation Principles Generally
"A modification of a contract is a change in the obligations of a party by a subsequent mutual agreement of the parties." ( West v. JPMorgan Chase Bank, N.A. , supra , 214 Cal.App.4th at p. 798, 154 Cal.Rptr.3d 285.) The language in the contract, as modified, must be interpreted as a whole and in the circumstances of the case; it cannot be found ambiguous in the abstract. ( Producers Dairy Delivery Co. v. Sentry Ins. (1986) 41 Cal.3d 903, 916, fn. 7, 226 Cal.Rptr. 558, 718 P.2d 920.) "The proper interpretation of a contract is disputable if the contract is susceptible of more than one reasonable interpretation, that is, if the contract is ambiguous. An ambiguity may appear on the face of a contract, or extrinsic evidence may reveal a latent ambiguity." ( Fremont Indemnity Co. v. Fremont General Corp. (2007) 148 Cal.App.4th 97, 114, 55 Cal.Rptr.3d 621.) As our Supreme Court made clear in Pacific Gas & E. Co. , *288 however, "[a] court cannot determine based on only the four corners of a document, without provisionally considering any extrinsic evidence offered by the parties, that the meaning of the document is clear and unambiguous." ( Fremont Indemnity Co. , at p. 114, 55 Cal.Rptr.3d 621 [discussing Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co. (1968) 69 Cal.2d 33, 37, 69 Cal.Rptr. 561, 442 P.2d 641 ].)
"[W]here the terms of an agreement are ambiguous, they 'should be interpreted most strongly against the party who caused the uncertainty to exist.' [Citation.] Finally, 'when different constructions of a provision are otherwise equally proper, [the construction] to be taken [is the one] most favorable to the party in whose favor the provision was made.' " ( Sutherland v. Barclays American/Mortgage Corp. (1997) 53 Cal.App.4th 299, 310, 61 Cal.Rptr.2d 614 ( Sutherland ).)
B
Contract Documents
1
The Note
The note provides Moore agreed to make principal and interest payments on *786 the 15th day of every month from October 15, 2004, through September 15, 2034, to repay the $310,000 principal at a variable interest rate. Any amount remaining on September 15, 2034, would be paid in full on that date -- the maturity date. If Moore's "monthly payments [were] insufficient to pay the total amount of monthly interest that [wa]s due[,] ... the amount of interest that [wa]s not paid each month, called 'Deferred interest,' w[ould] be added to [his] Principal and w[ould] accrue interest at the same rate as the Principal." In the event the unpaid balance exceeded 125 percent of the principal originally borrowed, Moore's monthly payment would be recalculated such that Moore "w[ould] pay a new monthly payment which [wa]s equal to an amount that w[ould] be sufficient to repay [his] then unpaid balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments."
Pertinent to the issue at hand, Moore would be in default if "[he] d[id] not pay the full amount of each monthly payment on the date it [wa]s due." In that case, "the Lender [could] send [him] a written notice, called 'Notice of Default,' telling [him] that if [he] d[id] not pay the overdue amount by a certain date, the Lender [could] require [him] to pay immediately the amount *289 of Principal which ha[d] not been paid and all the interest that [he] owe[d] on that amount, plus any other amounts due under the Security Instrument." The lender's decision not to require Moore to pay immediately the full amount owed at the time of default would not preclude the lender from "do[ing] so if [Moore] [was] in default at a later time."
The note further states the "the Security Instrument dated the same date as th[e] Note g[ave] the Lender security against which it [could] proceed if [Moore] d[id] not keep the promises which [he] made in th[e] Note."
2
The Deed Of Trust
The deed of trust secured the note for the maximum aggregate principal balance of $387,500 -- 125 percent of the original principal note amount. It contains two provisions outlining the lender's rights in the event of default. The first provision is entitled "Lender's Rights" and states: "Even if Lender does not exercise or enforce any of its rights under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 28 below to demand that [Moore] make immediate payment in full of the amounts that [Moore] owe[s] to Lender under the Secured Notes and under this Security Instrument."
The second provision is contained in paragraph 28, entitled "Rights of the Lender if There is a Breach of Duty." That provision states that, if Moore breached his duty by failing to, among other things, "pay the full amount of each monthly payment on the date it [wa]s due," the "Lender [could] demand an immediate payment of all sums secured ... [and] [¶] ... [could] take action to have the Property sold under any applicable law. [¶] Lender [would] not have to give [him] notice of a Breach of Duty. If Lender d[id] not make a demand for full payment upon a Breach of Duty, Lender [could] make a demand for full payment upon any other Breach of Duty."
3
The Notice
The Notice was dated October 8, 2010. It states, in pertinent part:
*787 "After carefully reviewing the information you have provided, you are approved to enter into a forbearance plan under the Home Affordable *290 Unemployment Program. Please read this letter so that you understand the terms and conditions of the forbearance plan (the 'Plan').
"What_you_need_to_do ...
"You must make the new monthly 'forbearance plan payments' in place of your normal monthly mortgage payment. Send your monthly forbearance plan payments - instead of your normal monthly mortgage payment - as follows: [six payments of $599.42 each to be made on the first day of each month starting on November 1, 2010, and ending April 1, 2011]
"[¶] ... [¶]
"While you are performing under the terms of this Plan, your home will not be referred to foreclosure or sold at a foreclosure sale, if allowed by state law and/or investor guidelines.
"This Plan will be terminated, regardless of payments received, if the Borrower fails to submit timely, complete documentation as required by the Home Affordable Program(s) or by lender.
"The lender is under no obligation to enter into any further agreement, and this Plan shall not constitute a waiver of the lender's right to insist upon strict performance in the future.
"All of the provisions of the note and security instrument, except as herein provided, shall remain in full force and effect. Any breach of any provision of this Plan or non-compliance with this Plan, shall render the forbearance null and void, and at the option of the lender, without further notice to you, may terminate this Plan. The lender, at its option, may institute foreclosure proceedings according to the terms of the note and security instrument without regard to this Plan. In the event of foreclosure, you may incur additional expenses of attorney's fees and foreclosure costs.
"The due date of your loan will continue to be reported to the credit bureaus on a monthly basis."
C
The Contract Causes Of Action
1
Declaratory Relief
In his declaratory relief cause of action, Moore alleged an actual controversy existed regarding the parties' "respective rights and duties under the *291 applicable promissory note and deed of trust, as modified by the Plan," because Moore had not missed a loan payment and was not in default.
Moore sought a judicial determination of his rights and duties, and declarations that the Notice was a binding contract; Wells Fargo was precluded from seeking the balloon payment "both by the express terms of the Plan and by [its] failure to disclose that additional terms were in effect" and because it "failed to provide [Moore] with other loss mitigation options"; Moore was not actually in default on his loan; the pending foreclosure proceedings were invalid; and Wells Fargo's refusal to accept Moore's tendered payment excused him from his payment obligation and precluded the accrual of interest and late charges.
2
Breach Of The Implied Covenant Of Good Faith And Fair Dealing
To frame Moore's breach of implied covenant allegations, we begin with a brief background of the law. The implied covenant of good faith and fair dealing is implied by law in every contract to prevent a contracting party from depriving the other party of the benefits of *788 the contract. Thus, " ' "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." ' " ( Carma Developers (Cal.), Inc. v. Marathon Development California, Inc. (1992) 2 Cal.4th 342, 371, 6 Cal.Rptr.2d 467, 826 P.2d 710.) The failure to deal fairly or in good faith gives rise to an action for damages. (See Sutherland , supra , 53 Cal.App.4th at p. 314, 61 Cal.Rptr.2d 614.) "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." ( Carma Developers (Cal.), Inc. , at p. 372, 6 Cal.Rptr.2d 467, 826 P.2d 710.)
"It is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." ( Carma Developers (Cal.), Inc. v. Marathon Development California, Inc. , supra , 2 Cal.4th at p. 373, 6 Cal.Rptr.2d 467, 826 P.2d 710.) Violation of an express provision is not, however, required. ( Ibid. ) "Nor is it necessary that the party's conduct be dishonest. Dishonesty presupposes subjective immorality; the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive." ( Ibid. ) "A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable. [Citations.] In the case of a discretionary power, it has been suggested the covenant requires the party holding such power to exercise it 'for any purpose within the reasonable contemplation of the parties at the *292 time of formation -- to capture opportunities that were preserved upon entering the contract, interpreted objectively.' " ( Id. at p. 372, 6 Cal.Rptr.2d 467, 826 P.2d 710.)
"The issue of whether the implied covenant of good faith and fair dealing has been breached is ordinarily 'a question of fact unless only one inference [can] be drawn from the evidence.' " ( Hicks v. E. T. Legg & Associates (2001) 89 Cal.App.4th 496, 509, 108 Cal.Rptr.2d 10.)
Moore alleged an implied covenant of good faith and fair dealing was included in the Notice, precluding Wells Fargo from depriving Moore of the benefits of the agreement. He alleged the Plan was entered into pursuant to the HAMP guidelines and Wells Fargo was impliedly required to comply with the guidelines, including: notice, minimum duration of the forbearance period, extension and termination, and offering loss mitigation options upon expiration of the Plan.
Moore alleged Wells Fargo breached the implied covenant by, among other things: "misle[ading] [him] regarding the terms of the Plan and extensions thereof, including leading [him] to believe that the Plan payments constituted full payments of his loan as implied by the Plan agreement as opposed to partial and incomplete payments, resulting in arrearages and default, and that the Plan would protect [him] from the foreclosure of the Property"; failing to provide notice of Moore's duty to pay the balloon payment despite his inquiries "as to any additional liabilities he might incur relative to the Plan contract"; purposely limiting the training of its agents; and failing to comply with the HAMP guidelines regarding the minimum Plan forbearance period of 12 months, various notice requirements, and criteria for considering a HAMP application.
As a result of this alleged breach of the implied covenant, Moore was damaged in an amount to be shown according to proof.
D
The Trial Court Arguments And Rulings
1
Declaratory Relief
On the first day of trial, prior to jury selection, the trial court asked the parties *789 to argue their respective positions relating to the interpretation of the contract documents. The trial court explained it would exercise its power in *293 equity by examining the contract documents to determine whether there was a contract and what the provisions or conditions of the contract were. If the trial court found no meeting of the minds or that the contract terms were ambiguous, the court would permit the introduction of extrinsic evidence at trial to avoid duplication of testimony.
Moore argued the contract was ambiguous because the Notice required him to make the reduced payments "in place of" the normal payments and there was no indication that his payment of the reduced amounts would result in a default on the loan or trigger a balloon payment obligation at the end of the Plan term. Wells Fargo argued the term forbearance means the giving of further time to pay a debt or an agreement not to enforce a claim when it is due. It further argued the Notice had to be read in conjunction with the note, because it modified the note. Various note provisions, it argued, expressly vested Wells Fargo with the authority to deem Moore in default and to demand a balloon payment; Wells Fargo did not waive any rights under the note in the Notice.
The trial court issued a written ruling on October 26, 2015. Initially, the trial court expressed doubt as to whether the Notice qualified as a contract modification due to the lack of consideration; however, the court did not ultimately rule on the issue and presumed the existence of a valid modification.
The trial court considered Moore's offer of proof as to the extrinsic evidence he would introduce relating to the ambiguity in the contract terms, but concluded the proffered parol evidence was unnecessary because it "d[id] not aid in the interpretation of [the] contractual obligations of the parties in this case" given "[t]he issue in this case is not ambiguous terms in the Plan, but rather the absence of specificity or terms in the Plan." The court explained "[i]t is well settled that extrinsic evidence cannot be used to add a provision to the contract that was omitted by the parties."
The court framed the issue as "whether this [Notice] was meant to modify the terms of the note such that the defendant was willing to forgive or waive the full amounts due for each month during the forbearance period or whether the Plan merely permitted reduced monthly payments, but the plaintiff was still otherwise contractually obligated to become fully current when the plan terminated." The court concluded "the later [sic ] is a more reasonable interpretation given the nature of a forbearance. A forbearance occurs when the creditor, in exchange for consideration, agrees to wait for a period of time to collect the debt. It is the giving of further time for the payment of a debt. [Citation.] A forbearance is not the modification of the loan terms or the forgiveness of debt. There is nothing in the written terms of this [Notice] providing that the defendant was willing to waive, forgive, or agree to *294 otherwise amortize back into the principal the past due full amounts.... [¶] While it is true the [Notice] received by the plaintiff [did] not explain how the shortage would be considered, neither did it contain a promise by the defendant to waive or [forgive the debt]." The trial court further noted Moore had a duty to make a reasonable inquiry regarding the terms and was bound by the terms of the deed of trust and the note even if he did not read them.
The trial court disagreed with Moore's argument that the HAMP guidelines set forth in Directive 10-04 were incorporated into the terms of the Notice. The court explained "th[o]se directives are actually *790 part of a contractual agreement between the Federal government and servicers" and Moore "has no private right of action ... to enforce HAMP guidelines [because it] is not a third party beneficiary to HAMP contracts."
The trial court interpreted the rights and obligations of the parties as follows:
"That when the plaintiff began making reduced payments in accordance with the Plan notice, the defendant could not declare the plaintiff in default or commence foreclosure proceedings if payment and notice requirements were met;
"That the [plaintiff] could not be charged late fees or other charges related to a delinquency during the time the plaintiff was making reduced payments under the plan;
"That the defendant could unilaterally terminate the plan at any time;
"That upon termination of the plan by the defendant, the plaintiff was obligated to become fully current by paying the full amounts then due under the terms of the note and deed of trust;
"That upon termination of the plan, if the plaintiff did not become fully current under the terms of the note and deed of trust, it would constitute a breach of contract and the defendant could commence foreclosure proceedings in accordance with the terms of the note and/or deed of trust."
2
Breach Of The Implied Covenant Of Good Faith And Fair Dealing
After Moore rested his case at trial, Wells Fargo verbally moved for nonsuit on the breach of the implied covenant cause of action. " 'A nonsuit in *295 a jury case or a directed verdict may be granted only when disregarding conflicting evidence, giving to the plaintiffs' evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in their favor. [Citations.]' [Citation.] Nonsuit is appropriate where the plaintiff's proof raises nothing more than speculation, suspicion or conjecture." ( Hernandez v. Amcord, Inc. (2013) 215 Cal.App.4th 659, 669, 156 Cal.Rptr.3d 90.)
Wells Fargo argued nonsuit was appropriate because Moore did not demonstrate his compliance with the contract terms, did not show a breach by Wells Fargo (either because the trial court had already found the basis for the claim preempted or it would impose an obligation different from the express terms of the contract as interpreted by the trial court), and Moore did not prove any damages resulting from such breach. Moore responded Wells Fargo had waived any noncompliance by Moore when it agreed to extend the Plan period and the balloon payment, among other things, constituted damages because it was a debt not otherwise owed by Moore in the absence of Wells Fargo's breach. Wells Fargo disagreed the balloon payment could constitute damages because: (1) Moore had not yet paid the balloon payment; and (2) the trial court already ruled Wells Fargo was expressly permitted by contract to demand the balloon payment.
The trial court granted nonsuit, finding "there ha[d] been no evidence of a breach of contract in light of the Court's interpretation of the contract" and "no evidence as a matter of law as to appropriate damages."
We review the trial court's nonsuit ruling de novo, resolving all presumptions, inferences and doubts in favor of the plaintiff. ( *791 Hernandez v. Amcord, Inc. , supra , 215 Cal.App.4th at p. 669, 156 Cal.Rptr.3d 90.)
E
The Contract Interpretation Issue Is Not Moot
Wells Fargo argues the nonjudicial foreclosure of Moore's property after trial rendered Moore's appeal of the declaratory relief ruling moot because the foreclosure "terminated the contractual relationship between him and Wells Fargo" leaving no present or ongoing controversy for our determination.[4] It is true, as Wells Fargo urges, declaratory relief operates prospectively and there is no basis for declaratory relief where only past wrongs are involved. ( *296 Baldwin v. Marina City Properties, Inc. (1978) 79 Cal.App.3d 393, 407, 145 Cal.Rptr. 406.) " 'It necessarily follows that when, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for this court, if it should decide the case in favor of plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal.' " ( Consol. etc. Corp. v. United A. etc. Workers (1946) 27 Cal.2d 859, 863, 167 P.2d 725.)
"The general rule regarding mootness, however, is tempered by the court's discretionary authority to decide moot issues. When an action involves a matter of continuing public interest that is likely to recur, a court may exercise an inherent discretion to resolve that issue, even if an event occurring during the pendency of the appeal normally would render the matter moot. [Citations.] Another exception exists when, despite the happening of a subsequent event, material questions remain for the court's determination. [Citations.] This exception has been applied to declaratory relief actions on the basis that the court must do complete justice once jurisdiction has been assumed." ( Building a Better Redondo, Inc. v. City of Redondo Beach (2012) 203 Cal.App.4th 852, 867, 137 Cal.Rptr.3d 622.) "[T]he relief thus granted may encompass future and contingent legal rights." ( Eye Dog Foundation v. State Board of Guide Dogs for the Blind (1967) 67 Cal.2d 536, 541, 63 Cal.Rptr. 21, 432 P.2d 717.)
Here, the foreclosure did not occur without any fault of the defendant; indeed, Wells Fargo affirmatively took steps to complete the nonjudicial foreclosure following trial. More importantly, even though the foreclosure may have mooted any prospective declaration with respect to the contractual relationship between the parties, a material question remains for our determination. We must reach the merits of the trial court's contract interpretation ruling because it materially impacts the trial court's ruling on the breach of the implied covenant cause of action -- to which Wells Fargo correctly does not raise a mootness challenge. The foreclosure did not render impossible our ability to grant Moore effectual relief on his contract interpretation claim. Accordingly, we reach the merits of the trial court's contract interpretation ruling.
F
The Terms Of The Contract Documents Are Ambiguous
The question before us is whether the contract documents (as modified by the Notice) interpreted together are reasonably susceptible to the interpretations urged by Wells Fargo -- that it could deem Moore in default and demand a balloon *792 payment at the end of the Plan term -- and Moore -- that the Notice *297 "provided that Wells Fargo would accept reduced payments during the [Plan] period, modifying the loan requiring larger payments" such that Wells Fargo "had no basis to put Moore in default, report his deficiency to credit agencies, or demand that Moore make a balloon payment at the end of the period."
As previously indicated, our review as to ambiguity is independent of the trial court's decision. We conclude the contract documents are susceptible to each party's interpretation, rendering the language ambiguous.
The note defines default as the failure to pay the full amount of each monthly payment on the date it is due and the deed of trust defines breach of duty as the same. It was the default and breach of duty provisions in the note and deed of trust that provided Wells Fargo with the right to demand a balloon payment and to deem Moore in default of the loan agreement. The Notice stated it was a forbearance agreement (without defining that term) and required Moore to "make the new monthly 'forbearance plan payments' in place of [his] normal monthly mortgage payment" on the first of each of the six months identified therein (as opposed to the 15th day of each month, as stated in the note). (Italics added.) The Notice further stated: "All of the provisions of the note and security instrument, except as herein provided, shall remain in full force and effect."
The language could be read, as the trial court found, that Moore's in-lieu payments under the Plan were merely forbearance payments in exchange for the promise not to foreclose on the property. That is that the payments "in place of" the normal monthly payment were not the "full amount of each monthly payment" under the terms of the note and deed of trust but rather a payment for giving of further time to pay the debt and to not enforce the default when it was due. Under this interpretation, Moore would be in default for failing to pay the full amount of each monthly payment and the "no waiver" provision in the Notice would have preserved Wells Fargo's right to demand a balloon payment at the end of the Plan period as provided in the note.
The language is also reasonably susceptible to the interpretation that the new monthly reduced payments were the "full amount of each monthly payment" due on the first day of each of the six months identified in the Notice. The change in the payment amount and the due date would be the provisions "as herein provided" for purposes of the clause, "[a]ll of the provisions of the note and security instrument, except as herein provided, shall remain in full force and effect." Under this interpretation, if Moore paid the $599.42 each month as required in the Notice (and any extension thereof), Moore could not be deemed in default or in breach of duty because he was paying the "full amount of each monthly payment" required under the modified contract. It *298 follows that, if Moore complied with the terms of the Notice, Wells Fargo could not demand a balloon payment for the difference between the regular and modified monthly payments at the end of the Plan term.
Moore's interpretation does not negate the "no waiver" language in the Notice. That provision is reasonably susceptible to the interpretation that Wells Fargo retained its rights to deem Moore in default and breach of duty for any reason stated in the note and deed of trust after the Plan term expired, and for any reason not modified in the Notice during the Plan term (e.g., if Moore made a misrepresentation on his loan application). Under such circumstances, *793 while Wells Fargo could not deem Moore in default for failing to pay the difference between the regular and reduced monthly payments, it could deem Moore in default for several other reasons -- for example, if Moore had failed to timely pay the reduced monthly payments.
Moore's interpretation is also not inconsistent with the definition of forbearance. The existing note provisions would allow Moore additional time to pay the sum of the difference between the normal and reduced monthly payments either by allowing him until the end of the loan term to do so or by increasing his monthly loan payment in equal amounts at some point in the future to bring the amount owed below 125 percent of the principal at the beginning of the loan. Both scenarios are consistent with the concept of forbearance. Such an interpretation does not result in a partial forgiveness of the debt. It also does not constitute a restructuring of the loan because the interpretation is based on the existing terms of the loan agreement.
Moore's interpretation further does not lead to an impossibility. Wells Fargo argues "as a matter of simple arithmetic, it would not be possible for [Moore] to go back to his original payments if the arrearage was applied to the principal." Thus, Wells Fargo posits, "the proffered parol evidence that he would go back to his old payment does not support an interpretation that the arrearage would be put back on the principal." Wells Fargo fails to account, however, for the express provisions in the note providing any amount remaining on September 15, 2034, would be paid in full on that date and, if the balance exceeded 125 percent of the original principal, the monthly payment would be recalculated. Applying those provisions to Moore's interpretation, if Moore resumed his normal monthly payments following the expiration of the Plan term, the sum of the difference between the normal and reduced monthly payments would be due on or before September 15, 2034, or could lead to the recalculation of his monthly payment if the amount owed exceeded 125 percent of the original principal. Whether such an interpretation is reasonable under the circumstances is a decision left to the trier of fact.
*299 This case bears similarities to Sutherland. In Sutherland , the plaintiff "owned a condominium that sustained severe damage in an earthquake. Sutherland contacted her mortgage company, explained what had happened, and stated that she had to move out of the damaged unit and rent another residence. The mortgage company agreed to put a 'stop' on her account for three months, during which time she did not have to make any payments. Sutherland believed that the 'stop' period was intended to give her a financial break to deal with the unexpected costs of the earthquake. She thought that, at the end of the three-month period, her mortgage payments would resume in the regular amounts, thereby extending the life of the mortgage by three months. [¶] A week before the end of the 'stop' period, [however,] the mortgage company informed Sutherland that her next scheduled payment had to include not only the regular monthly amount but also the sum of the three months' payments not made during the 'stop' period" -- i.e., a balloon payment. ( Sutherland , supra , 53 Cal.App.4th at pp. 303-304, 61 Cal.Rptr.2d 614.)
Sutherland sued the mortgage company for, among other things, breach of oral contract. ( Sutherland , supra , 53 Cal.App.4th at p. 308, 61 Cal.Rptr.2d 614.) Barclays moved for summary judgment, which the trial court granted. ( Id. at p. 309, 61 Cal.Rptr.2d 614.) The Court of Appeal reversed. ( Id. at p. 318, 61 Cal.Rptr.2d 614.)
*794 The Court of Appeal explained the circumstances surrounding the oral agreement supported Sutherland's position because Barclays should have understood that "if an earthquake victim needs immediate relief from her loan payments, it does little good to require that the excused payments be made three months later in a lump sum." ( Sutherland , supra , 53 Cal.App.4th at p. 310, 61 Cal.Rptr.2d 614.) It further said: "Even if we ignore the circumstances surrounding the parties' oral agreement, we cannot conclude that an agreement to 'stop' a loan account for three months means that, as a matter of law, the excused payments will all be due in the fourth month. A mortgagee's statement that it will temporarily 'stop' an account does not indicate with reasonable certainty when the excused payments have to be made. Such a statement is ambiguous and should arguably be construed in favor of the borrower. [Citation.] Moreover, to the extent the parties' competing interpretations of the 'stop' payment agreement are equally plausible, the agreement should be interpreted in favor of the borrower, since it was for her benefit that the agreement was made." ( Id. at p. 311, 61 Cal.Rptr.2d 614.)
The same is true here. Nothing in the Notice (or the note or deed of trust for that matter) indicates "with reasonable certainty when the [difference between the reduced and normal payments] ha[d] to be made." ( Sutherland , supra , 53 Cal.App.4th at p. 311, 61 Cal.Rptr.2d 614.) The contract documents are therefore ambiguous with respect to that term and should arguably be construed in favor of the borrower. ( Ibid. )
*300 Having found the language of the modified contract documents ambiguous, we reverse the trial court's ruling on the declaratory relief cause of action and remand the contract interpretation issue to the trial court for resolution by the trier of fact. In its analysis, the trier of fact shall consider the proffered extrinsic evidence of the parties' conduct before the controversy arose, including their communications before and after the contract modification. ( Universal Sales Corp. v. Cal. etc. Mfg. Co. (1942) 20 Cal.2d 751, 761, 128 P.2d 665 ["[W]hen a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court"].)
We reverse the trial court's nonsuit ruling on the breach of the implied covenant cause of action for the same reason because it was based entirely on the trial court's interpretation of the contract documents. In essence, the trial court concluded Moore could not imply a covenant into the contract documents precluded by the express terms, as interpreted by the trial court. Indeed, the trial court found there had been no evidence of a breach of contract and no evidence of damages "as a matter of law" "in light of the Court's interpretation of the contract." The breach of the implied covenant cause of action can be resolved only after a trier of fact resolves the contract interpretation issue. The trier of fact must then determine whether Wells Fargo's actions (including its balloon payment demand) deprived Moore of the benefit of the modified contract documents.
II-V**
Negligence
DISPOSITION
We reverse: (1) the amended final judgment in favor of Wells Fargo "on the Third *795 Amended Complaint and all causes of action alleged therein" filed April 4, 2016; (2) the trial court's ruling on Moore's declaratory relief cause of action as set forth in the October 26, 2015 written decision titled, "Trial Court Ruling on Defendant's Motion For Judgment on the Pleadings and Rulings on Motions in Limine"; (3) the trial court's ruling on Moore's breach of the implied covenant of good faith and fair dealing as orally pronounced on November 12, 2015; (4) the trial court's ruling on Wells Fargo's motion for judgment on the pleadings with regard to Moore's negligence cause of action as set forth in the October 26, 2015, written decision titled, "Trial Court Ruling on Defendant's Motion for Judgment on the Pleadings and Rulings on *301 Motions in Limine"; (5) the trial court's ruling in favor of Wells Fargo on its motion for judgment notwithstanding the verdict as set forth in the February 18, 2016, written decision titled, "Trial Court Ruling Granting the Defendant's Motion for Judgment Not Withstanding [sic ] the Jury Verdicts"; (6) the trial court's ruling in favor of Wells Fargo on the unfair competition law cause of action as set forth in the December 21, 2015, written decision titled, "Trial Court Ruling and Finding Re: Plaintiff's Seventh Cause of Action - Violation of Business and Professions Code [section] 17200 ; Entry of Judgment"; and (7) the trial court's ruling granting Wells Fargo's motion for costs and attorney fees as set forth in the August 23, 2018, written decision titled, "Trial Court Determination and Order Re: Costs and Attorney Fees."
The jury's verdict in favor of Moore on the intentional misrepresentation cause of action is reinstated. Moore shall recover his costs on appeal. ( Cal. Rules of Court, rule 8.278(a)(1), (2).)
We concur:
Raye, P. J.
Duarte, J.

Although it is unclear, it appears that some or all of the transactions at issue in this litigation involved Wachovia Bank, which was merged into Wells Fargo. (See DeLeon v. Wells Fargo Bank, N.A. (N.D.Cal. 2010) 729 F.Supp.2d 1119, 1121 ["World Savings had changed its name to Wachovia Mortgage, FSB and then merged into Wells Fargo Bank, N.A."].) The trial court's pertinent rulings pertain only to Wells Fargo and Wells Fargo does not dispute that it is the proper defendant to defend against Moore's allegations asserted herein.

Plaintiff filed an authorized amendment to the third amended complaint. The amendment was not provided in the appellate record, and Moore asserts it is irrelevant to the issues on appeal.

At oral argument, the parties agreed Moore did not make the September payment and was technically in default.

Moore does not address the argument.