Filed 12/29/20  AHZ Co. v. Sharp Healthcare CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| AHZ CO., INC.,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SHARP HEALTHCARE,<br><br>    Defendant and Appellant. | D075975<br><br><br>(Super. Ct. No. 37-2016-00044635-CU-OR-CTL) |
| AHZ CO., INC.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SHARP HEALTHCARE,<br><br>    Defendant and Respondent. | D076362 |

APPEALS from a judgment and order of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Affirmed.

Higgs Fletcher & Mack, John Morris and Rachel Moffitt Garrard for Defendant and Appellant.

Hamilton & Associates, Ben-Thomas Hamilton, Michaele M. Gonzalez, and Michael W. Ibach for Plaintiff and Appellant.

This case involves a dispute between corporate neighbors over a coveted and finite resource: parking spaces. In 2016, Sharp Healthcare (Sharp) purchased a property it had previously leased for more than a decade, believing an easement created in 1990 entitled it to exclusive use of two parking areas attached to the neighboring property. Sharp's neighbor, AHZ. Co., Inc. (AHZ), thought otherwise. Tensions mounted over this difference of opinion—"no parking" signs appeared, security guards were deployed to the parking lots, and cease-and-desist letters were sent. The conflict culminated in a bench trial, where the court found that AHZ and Sharp had to share the parking areas. Sharp appeals the ruling, arguing that the court's interpretation of the easement agreement was flawed. AHZ filed its own appeal taking issue with the court's decision not to award any attorney's fees and costs. We consider these cases together and affirm the trial court's conclusions on both issues.

FACTUAL AND PROCEDURAL BACKGROUND

The conflict in this case was seeded by the confusing terms of an easement agreement written long before either party owned their respective properties. To understand this context, we provide the relevant history of the buildings.

In the late 1980's, Donald Sammis was a major commercial property developer in the San Diego area. He purchased a lot on Activity Road and erected four buildings through his partnership entities. The developers referred to these buildings as sites A, B, C, and D. The C building was initially owned by Miramar Park Phase One Limited (Miramar) while the neighboring B building directly to the east was owned by LMIP. Both were Sammis partnerships. The C building was leased to Sharp in 1990. A year

later Miramar sold it to Carson Property Company, LP (Carson), which remained Sharp's landlord until Sharp bought the building in 2016.

In November 1990, Sammis created an easement agreement (referred to here as "the agreement" or "the easement agreement") between Miramar and LMIP that established two different easements between the B and C buildings—one for access, called the "reciprocal easement," and one for parking, called the "parking easement."[1]  Under the reciprocal easement, the site owners granted to each other "a mutually reciprocal, appurtenant, *non-exclusive*" easement "for vehicular and pedestrian access" along the west side of the B building (italics added in first quote).  This easement apparently runs through part of the C site property as well, though it is not eminently clear from the associated diagrams.  The reciprocal easement did not involve any parking.  The "parking easement," on the other hand, was a unilateral grant from LMIP to Miramar of "an appurtenant, *exclusive*, permanent easement for the purposes of parking" on the north and south side lots on the B site (italics added).  Sammis apparently created several easements between the four properties in the complex around this time, but the controversy in this case concerns only the meaning of the November 1990 agreement.

The following picture shows the B and C sites and approximate locations of the parking and reciprocal easements.  As depicted, the reciprocal easement runs between the two buildings, along the B site's western side, while the parking easement covers two lots on the north and the south sides of the B building.

---

[1]     Strangely enough, Sammis seems to have brokered the terms of the agreement with himself.  Sammis was the general partner and signatory for both LMIP and Miramar.



| C Site | B Site |
|---|---|
| Owned by Miramar, later Sharp | Owned by LMIP, later AHZ |

In 2005, the B site changed hands when Zabihullah Abdullah, the owner of AHZ, bought the property. There were signs of a budding conflict over the parking as early as 2012 when AHZ sent a letter to Carson complaining about Sharp's excessive use of the shared parking areas. But the controversy did not mature until Sharp bought the C site in 2016. Sharp was apparently convinced prior to its purchase that the parking easement granted the C site exclusive use of the north and south lots on the B property. At some point during Sharp's escrow period, Abdullah placed "no parking" signs in the parking easement area. Sharp responded by posting security guards on the north and south lots to turn away any cars that were unaffiliated with Sharp. AHZ then sent a cease-and-desist letter and initiated litigation.

AHZ sued for several forms of relief, including (1) termination of all the easements based on Sharp's monopolization of the parking areas, (2) an injunction to prevent Sharp from stationing security guards on the B site, (3) damages for a variety of tort claims, and (4) a declaration as to the scope

4

of the easements. Sharp cross-complained, asking for a declaration of its right to exclusive use of the north and south parking and an injunction to prevent AHZ from continued interference.

The case proceeded to a bench trial. By that time, AHZ's position had evolved. It still argued the parking easement should be dissolved and it was entitled to damages, but it also advanced a theory that the parking easement violated zoning laws. A significant part of the trial was dedicated to this point, with experts proffered by both sides. Sharp rebutted the zoning argument, but it focused on the language in the easement agreement and framed the controversy as a case of buyer's remorse (because Abdullah had rushed the purchase and did not understand the easements).

After considering all the evidence, including a deposition of Sammis, the court described the litigation as a "lose-lose case," saying that no matter what it decided, one of the parties—or perhaps both—would be unhappy. It then found that the parking easement was not exclusive to Sharp alone. Although the language lent itself to more than one viable interpretation, the court noted ambiguity in the terms and the history of shared use, which only changed in 2016 when Sharp tried to assert exclusivity. It further concluded the parking easement did not violate zoning laws and that Sharp's actions did not merit termination or constitute the torts that AHZ had claimed. Lastly, it found that neither party had prevailed and declined to award attorney's fees and costs.

In this appeal, Sharp contests the judgment that it must share the parking easement with AHZ while AHZ argues it was entitled to attorney's fees and costs.

DISCUSSION

1.    *Interpreting the Parking Easement*

Easements are interpreted using the same general principles that govern contract interpretation. (*Hill v. San Jose Family Housing Partners, LLC* (2011) 198 Cal.App.4th 764, 777; Civ. Code, § 1066.) The primary goal is to determine the parties' intent. (*Hill, supra*, at p. 777; *Mosier v. Mead* (1955) 45 Cal.2d 629, 633.) This is not always apparent from the language of the contract itself, and courts "must ascertain and give effect to th[e] intention by determining what the parties meant by the words they used." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 38 (*Pacific Gas*).)

Unless the foundational extrinsic evidence presents a conflict that requires factual findings by the trial court, the interpretation of a contract is a question of law. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866; *Maryland Casualty Co. v. Nationwide Ins. Co.* (1998) 65 Cal.App.4th 21, 29.) Here, the parties draw different significance from the extrinsic facts but do not dispute the evidence itself. (See *Medical Operations Management, Inc. v. National Health Laboratories, Inc.* (1986) 176 Cal.App.3d 886, 892.) We thus "review the [a]greement in the context of the extrinsic evidence presented and make our own independent determination of the meaning." (*Ibid*.) The trial court did make limited factual findings based on the evidence submitted at trial, and we accordingly defer to the trial

court's judgment on those points.[2]  (See *Stratton v. First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1084.)

Our independent review accords with the trial court's conclusions.  The most reasonable reading of the parking easement is that the parties intended to create a shared parking area for the B and C sites on the B site's north and south sides.  (See *Aozora Bank, Ltd. v. 1333 North California Boulevard* (2004) 119 Cal.App.4th 1291, 1296.)  "Exclusive" thus meant that the building C owners could exclude third parties, but not the owners or tenants of the B site.

Before we proceed, we address Sharp's claim that the court improperly considered extrinsic evidence because it mistakenly believed the terms of the easement agreement were ambiguous.  It is indeed the case that in other jurisdictions, trial courts must make a threshold finding of ambiguity in a contract before considering extrinsic evidence to construe its meaning.  But the parol evidence rule works differently in California. (See *Pacific Gas, supra,* 69 Cal.2d 33; *Wilson Arlington Co. v. Prudential Ins. Co. of America* (9th Cir. 1990) 912 F.2d 366, 370–372; *Zenger-Miller, Inc. v. Training Team, GmbH* (N.D. Cal. 1991) 757 F.Supp. 1062, 1067.)  A court interpreting a contract in this state is tasked with discerning the *intent* of the parties, which is not always illuminated by the "magic words" in the document.  (*Pacific Gas, supra,* at p. 38.)  In search of intent, courts are permitted—and even encouraged—to look to evidence outside of the contract " 'to explain the

---

[2]    For example, the trial court made a factual finding that the parking in the parking easement area was "shared until very recently, until the guards were there" and that this had been the arrangement for "years and years." (See, e.g., *Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1449 ["the conduct of the parties after the execution of the contract, and before any controversy arose, may be considered in order to attempt to ascertain the parties' intention"].)

meaning of a written contract . . . [if] the meaning urged is one to which the written contract terms are reasonably susceptible.' " (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 343; quoting *BMW of North America, Inc. v. New Motor Vehicle Bd.* (1984) 162 Cal.App.3d 980, 990, fn. 4.) In fact, " '[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' " (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391; quoting *Pacific Gas, supra,* at p. 37.)

In the contract before us, the meaning of exclusivity is unclear. Although the reciprocal easement and the parking easement are respectively described as "non-exclusive" and "exclusive," the document does not define these terms. As a result, it is reasonably susceptible to two interpretations: that the parking easement gave the B and C site owners the right to exclude third parties from the parking areas (AHZ's position), or that it granted the C site owner the sole right to park there and thus the right to exclude users of the B site (Sharp's position). Faced with this uncertainty, we turn to the undisputed extrinsic evidence to clarify the parties' intent. This includes the surrounding circumstances, such as the parties' relationship and the purpose of the easement. (Civ. Code, §§ 1647, 1636; *Christian v. Flora* (2008) 164 Cal.App.4th 539, 550.)

As the sole signature on the easement agreement, the primary person who could illuminate the parties' intent at the time is Donald Sammis. If his recollection had been clearer, his deposition would be a significant source to draw from. Unfortunately, his memory did not reach back so far. In broad strokes, he recalled that his partnerships created a series of easements

8

between buildings A through D to ensure access and provide sufficient parking that was generally shared—but he did not know whether the parking easement from November 1990 was intended to convey exclusive parking to the C site at the expense of the B site. Although Sammis recalled that he was selling the C building to Carson around 1990 and it was generally interested in the parking available for its tenants, he could not remember specifics. The only thing clear about Sammis's deposition is the fuzziness of his recollection. We draw the same conclusion as the trial court—that he "really didn't remember."

Apart from Sammis, few sources can shed light on the intended meaning of the "exclusive" parking easement. But we glean some helpful, albeit limited, indicators from the conduct of Carson. Although Carson was not a party to the easement agreement, it bought the C site shortly after Sammis created it, and he recalled some discussion with Carson regarding the parking situation for the C site. If Sammis communicated the C site's entitlements under the new easement agreement, Carson might have been aware of his intent as to the parking on the B site's north and south lots. And there are two indications in the record that Carson did not believe the parking easement gave the C site an exclusive right to use those parking areas.

A series of letters exchanged by counsel for AHZ and Carson (later Sharp) came into evidence. In 2012, AHZ complained to Carson that their tenant, Sharp, was abusing the parking easements by monopolizing the spaces on the north, west, and south side of the B building.[3] Carson's

---

[3] Though not at issue in this appeal, a later easement allowed the C site to also park on the B site's western side, in the same general area where the reciprocal easement runs.

9

response states it was not aware of any evidence of unreasonable use of the parking easements but makes no mention of its exclusive right to use the north and south lots. Although we are hesitant to draw too much from counsel's letters, which may be cautiously drafted for numerous reasons, it would make little sense for Carson to allow an aggravated neighbor to persist in a misunderstanding if it believed it's tenant was entitled to the exclusive use of the parking lots. A follow up letter in 2014 from Carson asserts that the "easements plainly grant Sharp the right to park on the north, south, and west sides of the [B site] property," but again there is no mention of an *exclusive* right as to any of those areas. The first assertion of an exclusive right appears in a letter from April 2016, shortly before Sharp closed on its purchase of the C site.

Aside from these letters, there is evidence that Carson was at least reticent to assert Sharp's understanding of the parking easement. During their escrow period, Sharp asked their landlord to respond to AHZ's "no parking" signs by putting up Sharp signs in the north and south parking lots or by painting the stalls to say "Sharp." Carson declined to do either.

Little else helps clarify the original intent or purpose of the parking easement. But the habitual use of the areas for decades tips our analysis toward AHZ's interpretation. As the trial court noted, the parking dispute arose recently, but for many years the parking easement area was shared. Sharp disputes this finding by attacking Abdullah's foundational knowledge of who parked where, but it is well settled that it is the trial court is best suited to resolve factual disputes and evaluate witness credibility. (*Burch v. Premier Homes, LLC* (2011) 199 Cal.App.4th 730, 744–745.)

Sharp's final argument is that interpreting the parking easement as shared between Sharp and AHZ leads to an absurd construction of the

10

contract. In Sharp's view, because the easement agreement "refers to the exclusive nature of the parking easement consistently throughout the document" in contrast to the nonexclusive language associated with the reciprocal easement, it "strains credulity to insist that the parties intended to create only non-exclusive easements but still drafted two separate easement provisions." We follow Sharp's logic that creating two types of easements within one contract is nonsensical if they bestow all the same privileges. But that is not the case here.

Even as construed by the trial court, the two easements differ in two respects. First, they vary in the type of use they allow. The reciprocal easement did not involve parking; it was merely for pedestrians and vehicle *access* in the area between the B and C sites. Perhaps the two easements could have been called the "passage easement" and the "parking easement" to more clearly highlight this distinction, but the different purposes are clear enough and were never disputed by the parties. That distinction provides one reason to create two separate easements. The second reason would be a difference in degrees of exclusivity; regardless of the precise meaning of "exclusive," it is clear the contract meant to make the parking easement *more* exclusive than the reciprocal easement.

It is far from absurd to conclude from these differences in the two easements that the contract cannot sustain AHZ's interpretation of "exclusive." This is actually a logical interpretation given the nature of the corporate park; it would make sense for the B and C sites to grant each other nonexclusive rights to cut through the road and parking area between their buildings, without preventing each other from granting third parties similar access. It would further make sense to create an exclusive parking arrangement that entitled only Sharp and AHZ to park in certain lots on the

11

B site, setting aside spaces to prevent third parties affiliated with the neighboring buildings from parking there.

Regarding the language of the contract itself, we do not agree that this interpretation results in absurdity. In fact, it gives coherence to *more* of the contract than Sharp's alternative construction. Under the headings "Permitted Users," and "Definition of Owners," the agreement states as follows:

> "The Reciprocal Easements may be used, on a non-exclusive basis, by each Owner and tenant of an Owner and their respective officers, directors, employees . . . and by service and emergency vehicles and personnel as shall be necessary and appropriate to the lawful use of the Sharp 'C' site and the Building 'B' site. The Parking Easement may be used on an exclusive basis, by each Owner and tenant of an Owner and their respective officers, directors, employees . . . and by service and emergency vehicles and personnel as shall be necessary or appropriate to the lawful use of the Sharp 'C' site." [¶] . . . [¶]

> "As used herein, an 'Owner' means the holder of fee title to the Sharp 'C' Site (whether one or more persons or entities) and the holder of fee title to the Building 'B' Site (whether one or more persons or entities)."

Taking these sections together highlights the trouble with Sharp's interpretation. The "Permitted Users" section indicates the parking easement can be used by *each owner* and the definition of owner includes the entity that holds title to the B site. If the parking easement was always meant to exclude the B site owner, why would the "Permitted Users" section indicate it could be used by each owner in a general sense rather than the owner(s) of the C site alone? None of these tensions are created by AHZ's interpretation. Rather, if "exclusive" means exclusive *as to third parties,* the sections harmonize; both owners of the B and C sites can use the parking easement but neither owner can permit third party use.

12

Sharp seeks to downplay the problem with the "each Owner" reference by focusing on the last clause of the "Permitted Users" provision, suggesting that the closing phrase "as shall be necessary and appropriate to the lawful use of the Sharp 'C' site" modifies the term "each owner" and narrows it to the owner(s) of the C site. This strained reading tacitly admits that the parking easement as written is not, at least in theory, completely exclusive to Sharp. But moreover, there is a more natural reading available: the last clause only modifies "service and emergency vehicles and personnel" to clarify that these third parties providing important services are permitted to use the easement areas when necessary. Indeed, if the parking easement is as exclusive as Sharp argues, it is difficult to conceive of any situation in which the B site owner's use of the parking easement would be necessary and appropriate to *its* use of the C site.

Sharp marshals other clauses of the easement agreement to defend its position, but none of them necessarily support Sharp's construction of the term "exclusive." For example, it highlights the burdened and benefitted property sections of the easement agreement. These specify that the reciprocal easement runs through, and thus burdens and benefits, both properties while the parking easement, which only runs though the B property, burdens the B site and benefits the C site. But this is merely the nature of an easement, and it holds true under *either* construction of the exclusivity language; the parking easement would burden the B site *even if* it retains its previous entitlement to use its own parking. The same analysis applies to the "Purpose" section, which states the parking easement was meant to give parking to the C site. That is its obvious purpose, but it does not follow that extending additional parking to C necessarily means revoking it from B.

13

Sharp's last point, and perhaps its strongest, is that the section indicating the C site owners are responsible for all the parking easement's maintenance costs is consistent with their claim to exclusive use. We agree this is one logical explanation for the maintenance section, but it is not the only one. This arrangement could just as well be the C site's compensation for the benefit of using the B site's parking, even if it remains shared.

In the end, the terms of the agreement are susceptible to both AHZ's and Sharp's interpretations. Neither option is perfect, and both highlight problems in the contract and render some words surplusage. But this is not such a close case that both interpretations appear "equally proper." (*Moore v. Wells Fargo Bank, N.A.* (2019) 39 Cal.App.5th 280, 288.) After conducting a close reading and taking "[t]he whole of [the] contract . . . together, so as to give effect to every part, . . . each clause helping to interpret the other," we find more support for AHZ's construction. (Civ. Code, § 1641.) The limited extrinsic evidence also favors AHZ. We thus agree with the trial court's conclusion that the "exclusive" parking easement is *most* reasonably read to exclude third parties. It does not privilege the C site to exclude the B site from using the parking in its north and south lots.

2.     *Attorney's Fees and Costs*

After the court's resolution of the issues at trial, both Sharp and AHZ filed motions for recovery of attorney's fees and costs. (Civ. Code, § 1717; Code Civ. Proc., §§ 1032, subd. (a)(4), 1033.5.) The court found that neither party entirely prevailed and declined to make any award. AHZ contests the court's finding, asserting that it prevailed on its primary litigation objective and that the trial court abused its discretion in finding otherwise. As we explain below, we disagree.

14

Civil Code section 1717, subdivision (a) recognizes the ability of contracting parties to provide for the recovery of reasonable attorney's fees and costs by the prevailing party in a dispute.  At the same time, subdivision (b)(1) extends discretion to trial courts to determine there is no prevailing party when the results of the litigation are mixed.  (See *Hsu v. Abbara* (1995) 9 Cal.4th 863, 876 (*Hsu*).)  We review for abuse of discretion and leave the court's decision undisturbed unless it is unsupported by substantial evidence.  (*Pellegrino v. Robert Half Internat., Inc.* (2010) 182 Cal.App.4th 278, 288.)

*Hsu, supra,* 9 Cal.4th at page 876 established a blueprint for determining if there is a prevailing party in a contract dispute:  "[T]he trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources [to compare] 'the extent to which each party ha[s] succeeded and failed to succeed in its contentions.' "  This is precisely what the trial court did.  It considered each of AHZ and Sharp's litigation objectives and determined that both parties failed to achieve their chief aims.  "AHZ did not obtain termination of Sharp's easement rights and Sharp did not obtain the right to exclusive use of the parking areas. . . .  Although Sharp defeated the majority of AHZ's claims, AHZ prevailed in its efforts to enforce its easement rights."

In reviewing the record, we find the trial court's determination well supported, and there was no abuse of discretion here.  AHZ sought to terminate the parking easement, based on either a violation of zoning laws or Sharp's abuse of its privilege; it also brought multiple tort claims and sought millions in damages.  It succeeded only in vindicating its right to *use* the parking easement area.  Sharp's action was more tailored, seeking a

15

judgment that the parking easement was for its exclusive use and an injunction to prevent AHZ's interference.  The court could reasonably conclude that neither party prevailed.  In the end, both parties are subject to the existing parking easement, which they must share.  In the court's words, this was a lose-lose case.

## DISPOSITION

The judgment and order are affirmed.  AHZ is entitled to costs on appeal associated with case No. D075075, while Sharp is entitled to costs on appeal associated with case No. D076362.


DATO, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.